**Ronnie W. LONGMIRE, Plaintiff-Appellant,**

v.

**SEA DRILLING CORP., Defendant-Appellee.**

No. 77-2561.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1980.

Randy J. Ungar, New Orleans, La., for plaintiff-appellant.

Robert M. Contois, Jr., New Orleans, La., for defendant-appellee.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This is a suit by Ronnie Longmire (Longmire) against Sea Drilling Corporation (Sea Drilling) under the Jones Act and the Outer Continental Shelf Lands Act (OCSLA) seeking recovery for injuries sustained aboard a tender anchored adjacent to a fixed drilling platform on which Sea Drilling had been conducting drilling operations. The district court granted summary judgment in favor of Sea Drilling. It held that Longmire was not a seaman within the meaning of the Jones Act; and it held that the OCSLA, which in 1953 extended the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) to certain activities conducted on the Outer Continental Shelf, did not incorporate a 1972 amendment to the LHWCA that created a negligence cause of action against a vessel in favor of an injured covered employee. We affirm in part and reverse and remand in part.

The underlying facts are not in dispute. Sea Drilling employed Longmire as a floorhand or roughneck on an offshore drilling crew. The drilling platform was located on the Outer Continental Shelf off the coast of Louisiana. Before Longmire was injured he had worked two full hitches for Sea Drilling, each hitch consisting of seven days on and seven days off. His accident occurred during his third hitch for Sea Drilling. The drilling installation consisted of a drilling platform permanently affixed to the ocean floor and a tender, a converted LST named the *Sea Drilling 7*, anchored alongside and connected to the drilling platform by a hinged gangway, known in the industry by the disquieting term "widowmaker." The drilling was conducted entirely on the drilling platform, on which sat a drilling "rig," or derrick, which was installed for the purpose of drilling the well and which was moved to another platform when drilling was completed. The drilling operation was supported by the tender, which provided crew quarters, mess facilities, and the pumps, electrical power, and fuel necessary to operate the drill.

Longmire's principal duties were performed on the drilling platform. As part of the roughneck crew, his duties included

general labor such as maintenance of the platform and preparation of pipe for drilling. Occasionally Longmire would perform some duties on the tender, such as general maintenance work, moving supplies to or from the drilling platform, unloading and loading supply boats, and fixing the pumps for the drilling operation located on the tender. Longmire's third hitch for Sea Drilling was unusual inasmuch as no drilling occurred. The rig was being dismantled to be moved to another location in the Gulf, and during this hitch Longmire assisted in dismantling the rig and stowing equipment aboard the tender. On the day he was injured, Longmire had spent his entire shift stowing anchor chains aboard the tender as the vessel weighed anchor in preparation for the move. He was injured when he slipped as he tried to leave the room in which the anchor chains were stored.

### Longmire's Seaman Status

■ The Jones Act gives "[a]ny seaman who shall suffer a personal injury in the course of his employment" the right to bring an action for damages against his employer, but does not define the term "seaman."[1] We have noted in several past decisions how that term and the phrase "master or member of a crew of a vessel,"[2] although historically distinguishable, have come to be used interchangeably. *Noble Drilling Corp. v. Smith*, 412 F.2d 952, 955–

56 (5th Cir.), *cert. denied*, 396 U.S. 906, 90 S.Ct. 221, 24 L.Ed.2d 182 (1969); *Boatel, Inc. v. Delamore*, 379 F.2d 850, 859 (5th Cir. 1967); *Offshore Co. v. Robison*, 266 F.2d 769, 774 (5th Cir. 1959). In order to avail himself of the liberal terms of the Jones Act, Longmire must show that at the time of his injury he was a seaman on the *Sea Drilling 7* tender; if he was not, he is entitled to benefits under the LHWCA, *see* below.

■ To qualify as a Jones Act seaman, Longmire must be able to show that he was permanently assigned to or performed a substantial part of his work on the tender, and that the capacity of his employment contributed to the function of the tender, its mission, its operation, or its welfare. *Beard v. Shell Oil Co.*, 606 F.2d 515 at 516 (5th Cir. 1979); *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 326 (5th Cir. 1977); *Offshore Co. v. Robison*, 266 F.2d at 779. Although the question whether an injured employee was a seaman at the time of his injury is normally a question for the trier of fact, that is not necessarily so in every case. In recent years we have emphasized that, with regard to the allocation of the adjudicative function between judge and jury, the question of seaman status is no different from other factual determinations in which the ultimate determination is intimately related to the application of legal principles to specific underlying facts about what the parties did or did not do.[3] Whether the

---

1. The Jones Act provides:

 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdic-

tion in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

46 U.S.C. § 688 (1976).

2. Workers qualifying as a "master or member of a crew of a vessel" are excluded from the coverage of the LHWCA and the OCSLA. 33 U.S.C. § 902(3) (1976); 43 U.S.C.A. § 1333(b)(1) (West Supp.1979).

3. *See Senko v. LaCrosse Dredging Corp.*, 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404 (1957): "Our holding . . . that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion

question of seaman status is viewed as an "ultimate" fact[4] or a "mixed question of law and fact,"[5] the answer is always the same: "A court . . . may, in the proper case, hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman . . under the Jones Act." *Beard v. Shell Oil Co., supra* at p. 517. *See Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 479–80 (5th Cir. 1976), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977); *Owens v. Diamond M. Drilling Co.*, 487 F.2d 74, 76 (5th Cir. 1973) (summary judgment against claimant proper "where the only rational inference to be drawn from the evidence is that the claimant was not a seaman").

 In determining whether there is a reasonable evidentiary basis for submitting the issue of seaman status to the jury, the factors to be considered are:

(1) [whether] there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) *or* performed a substantial part of his work on the vessel; *and* (2) [whether] the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

*Robison*, 266 F.2d at 779 (emphasis added). Longmire has clearly met the second part of the test, for the work in which he was engaged at the time of his injury was stowing the anchor chain as the vessel prepared to make weigh. However, we think Longmire has not produced evidence tending to

show that he was permanently assigned to the vessel. In so stating we are cognizant of our acknowledgement in *Davis v. Hill Engineering, Inc., supra*, that "the word 'permanent' has never been given a literal interpretation under the Jones Act." 549 F.2d at 327. By his own admission, however, Longmire has indicated that his primary responsibilities concerned drilling operations on the drilling rig and platform, and that most of his work aboard the tender was only incidental thereto.

Whether Longmire performed a substantial part of his work on the tender is a harder question on the facts of this case. We said in *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 732 (5th Cir. 1972), that "to meet the requirement of *Robison* that the workman 'performed a substantial part of his work on the vessel' it must be shown that he performed a significant part of his work aboard the ship with at least some degree of regularity and continuity." Thus the question of substantiality comprehends more than a mere quantitative assessment of where the claimant spent the greater part of his working day. As we have already said, though, Longmire's primary responsibilities concerned drilling operations on the platform. Because of the symbiotic relationship between the tender and the drilling platform in this case, Longmire's performance of those duties necessarily carried him onto the tender from time to time. In this regard the vessel was no more than a storeroom or warehouse in relation to the drilling platform, except for the fact that it was afloat rather than affixed to the seabed. Longmire's work on the tender also occasionally involved general maintenance tasks, such as cleaning and painting. These tasks aboard the tender, however, were assigned to Longmire and others on the drilling crew only when there

---

they have in finding negligence or any other fact."

**4.** *See Warner Co. v. Norton*, 137 F.2d 57, 58 (3d Cir. 1943), *aff'd*, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944).

**5.** *See Keener v. Transworld Drilling Co.*, 468 F.2d 729, 730 (5th Cir. 1972).

was nothing to do with respect to the drilling operation. Longmire's assignment to those tasks was irregular and fortuitous, entirely dependent upon and subsidiary to the progress of the drilling operation. *See Keener*, 468 F.2d at 731; *Owens*, 487 F.2d at 75.

This case involves an additional complexity, however, in that Longmire was injured while actually working aboard the tender. In *Keener* we specifically reserved the question whether a claimant's work aboard a vessel, which would otherwise be insufficient to vest him with seaman's status, would be "sufficient to afford him seaman's status during the period of his occupation with the tasks aboard the tender." 468 F.2d at 731. We now answer that question in the negative. The issue of an injured worker's status as a seaman should be addressed with reference to the nature and location of his occupation taken as a whole. While it is true that Longmire was injured aboard a vessel while performing a task that would normally be handled by a member of the ship's crew, he was assigned that task when there was no drilling operation

as such in progress. In preparation for a move to another location, the drilling rig was dismantled and the tender was about to be towed by a tug to another drilling platform. It can hardly be said that Longmire's incidental activities aboard the tender—maintenance, moving supplies to and from the drilling platform, and stowing the anchor chain—were sufficient, when viewed in the context of his entire employment as a member of the drilling crew, to amount to performance of "a significant part of his work aboard the ship with . . some degree of regularity and continuity."[6] We therefore affirm the district court's summary judgment in favor of Sea Drilling on the issue of Longmire's seaman status.

### The § 905(b) Negligence Action

We now turn to the question whether Longmire may bring an action for negligence against Sea Drilling predicated upon § 905(b) of the LHWCA. Longmire's rights with respect to the LHWCA are derived from § 1333(b)[7] of the OCSLA,[8] which provides:

> With respect to disability or death of an employee resulting from any injury

**6.** Our holding on this issue should not be taken to mean "once a platform worker, always a platform worker," nor that one who has been a platform worker cannot become a seaman until he has been working as a seaman for some time. When seaman's status is sought on the theory that the claimant has performed a substantial part of his work on the vessel, however, the circumstances of the claimant's injury cannot be viewed in isolation but must be considered in relation to his other regular duties. We do not preclude the possibility that an informal and temporary change of duties, though not tantamount to permanent assignment to a vessel, may be sufficient to effect an immediate change in the worker's status to that of a seaman if the change of duties involves work that would normally be done by a member of a ship's crew and it can reasonably be said that, taking into consideration all the circumstances of his employment, the change involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the "function of the vessel, its mission, its operation, or its welfare." *Cf. Beard v. Shell Oil Co.*, 606 F.2d at 517 (5th Cir. 1979). What is to be avoided is engrafting upon the statutory classification of a "seaman" a judicial gloss so protean, elusive, or arbitrary as to permit a worker

to walk into and out of coverage in the course of his regular duties.

**7.** The section is cited in text as it appears following the 1978 amendments to the OCSLA. Those amendments worked no substantive change in § 1333. When Mr. Longmire was injured, however, the quoted provision was worded differently and was denominated § 1333(c). The minor changes in wording have no effect in this case.

**8.** The Act defines the shelf as all submerged lands lying outside of a line three geographical miles distant from the coast line of each state. The Act contains a proviso that state waters may extend beyond this limit if such boundary existed at the time the state became a member of the Union. Under this provision, Texas is entitled to a marine boundary three leagues (10.36 geographical miles) from shore by virtue of an historical claim recognized upon admission in 1845. United States v. Louisiana, 363 U.S. [1], 36 [80 S.Ct. 961, 4 L.Ed.2d 1025] (1960). Florida has a marine boundary extending three leagues into the Gulf because of Article I of Florida's Constitution of 1868, approved by Congress upon readmission during Recon-

occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act. For the purposes of the extension of the provisions of the Longshoremen's and Harbor Workers' Compensation Act under this section—

(1) the term "employee" does not include a master or member of a crew of any vessel, or an officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof;

(2) the term "employer" means an employer any of whose employees are employed in such operations; and

(3) the term "United States" when used in a geographical sense includes the outer Continental Shelf and artificial islands and fixed structures thereon.

43 U.S.C.A. § 1333(b) (West Supp.1979). Section 1333(b) thus contains only the very broad requirement that the injury must occur as a result of the operations therein described. The OCSLA covers fixed platform workers, while floating rig workers, even those whose tasks are essentially identical to the tasks performed by fixed plat-

form workers, are treated differently. The reason for the different treatment of fixed and floating rig workers is that floating rigs are treated like vessels [9] while fixed platforms are considered "artificial islands." [10] Since the OCSLA specifically excludes "seamen" from coverage, those workers are still covered by the Jones Act notwithstanding that their injuries may have resulted from activities described in § 1333(b).

The first version of the OCSLA introduced to the Senate would have treated fixed platform drilling rigs located on the Outer Continental Shelf as if they were vessels, and general maritime law and the Jones Act would have applied to them. That version, however, was rejected in favor of the enacted version, which treats the structures as if they are islands to which federal law applies. The reason for the change was apparently Congress' belief that general maritime law would provide inadequate protection for workers who were engaged essentially in an industrial occupation. For example, in introducing the revised bill to the Senate, Senator Gordon said:

[F]urther consideration clearly showed that [treating fixed rigs like vessels] was not an adequate and complete answer to the problem. The so-called social laws necessary for protection of the workers and their families would not apply. I refer to such things as unemployment laws, industrial-accident laws, fair-labor-standard laws, and so forth.

99 Cong.Rec. 6963 (1953) (remarks of Sen. Gordon). We believe that Congress, recog-

---

struction. United States v. Florida, 363 U.S. 121, 127 [80 S.Ct. 1026, 4 L.Ed.2d 1096] (1960).

Robertson, *Injuries to Marine Petroleum Workers: A Plea for Radical Simplification*, 55 Texas L.Rev. 973, 986 n. 96 (1977).

9. *See* Annot., 75 A.L.R.2d 1312 (1961).

10. *See Rodrigue v. Aetna Cas. Co.*, 395 U.S. 352, 362, 89 S.Ct. 1835, 1840, 23 L.Ed.2d 360 (1969): "Senator Ellender asserted that in the first draft [of the OCSLA] it 'was sought to treat the platforms or artificial islands created in the water as ships' but now the 'islands are

made subject to our domestic law' instead so as to be 'treated just as though they were islands created by nature, insofar as the application of our domestic laws is concerned.' 99 Cong.Rec. 7235." *See also Bertrand v. Shell Oil Co.*, 489 F.2d 293, 295 (5th Cir. 1974); *Callahan v. Fluor Ocean Serv., Inc.*, 482 F.2d 1350, 1351 (5th Cir. 1973); *Bible v. Chevron Oil Co.*, 460 F.2d 1218 (5th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972); *Bertrand v. Forest Corp.*, 441 F.2d 809, 811 (5th Cir.), *cert. denied*, 404 U.S. 863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971).

nizing the need for some remedial system applicable to injuries sustained by petroleum and other mineral workers on the Outer Continental Shelf, determined that the best solution was to treat those workers as if they were longshoremen and to extend to them the full panoply of coverage under the LHWCA.

In 1927 Congress enacted the LHWCA to fill the gap left in workmen's compensation coverage created by the Supreme Court's holding, in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), that state workmen's compensation systems could not reach seaward of the water's edge. *Pfeiffer Co. v. Ford*, —— U.S. ——, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). The Act limited coverage to workers injured "upon the navigable waters of the United States (including any dry dock) . . . ." Longshoremen's and Harbor Workers' Compensation Act of 1927, ch. 509, § 3(a), 44 Stat. 1426. Thereafter, the Act was construed not to extend to any injury sustained on land, or even on a pier attached to land but extending over water. *See, e. g., Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 218–20, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). Congress amended the LHWCA in 1972, and substantially revised the scope of coverage of the Act.[11] Significant for our purposes, however, is the change wrought by the 1972 amendments in the rights of covered workers to recover for their injuries. The pre-1972 Act established a compensation scheme, similar to state workmen's compensation systems, that provided payments to an injured employee without regard to the employer's fault (or

lack of it) or the possible contributory fault of the employee.[12] The pre-1972 Act also provided that the described compensation liability of the employer was to be exclusive. As we observed in *Smith v. M/V Captain Fred*, 546 F.2d 119, 120 (5th Cir. 1977), "this provision in time became but a hollow promise." First, the Supreme Court's decision in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), permitted a longshoreman who was injured while performing work traditionally performed by seamen on a vessel owned by someone other than the injured longshoreman's employer to bring an action against the vessel based on the vessel's absolute, nondelegable duty to provide a seaworthy vessel, even if the "unseaworthy" condition had been created by the longshoring crew. Ten years later, in *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that a vessel liable under *Sieracki* circumstances could obtain indemnification from the longshoreman's employer (the stevedore), on the theory that the creation of the unseaworthy condition by the longshoring crew was a breach of the stevedore's implied warranty of workmanlike performance. Thus, after *Sieracki* and *Ryan* the stevedore's liability to his employees was no longer confined to the compensation obligation established in the LHWCA. Finally, in 1963 the Court held that when the stevedore was also the operator of the vessel on which the longshoreman was injured, the longshoreman could bring his action predicated on unseaworthiness against his employer, the stevedore. *Reed*

11. Congress replaced the original rigid situs requirement with a two-fold situs and status test. 33 U.S.C. §§ 902(3), 903(a) (1976). The current situs test reads as follows: ". . . upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." 33 U.S.C. § 903(a). The current status test defines an employee as "any person engaged in maritime employment, including any longshoreman or other person engaged in

longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker . . . ." 33 U.S.C. § 902(3) (1976).

12. The original Act contained the proviso, unchanged by the 1972 amendments, that: "No compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another." 33 U.S.C. § 903(b) (1976).

*v. The Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963).

The 1972 amendments addressed the inequities Congress perceived in this situation. The unseaworthiness action, being a species of strict liability, imposed on the longshoreman's employer a significantly more burdensome duty than was imposed on his inland counterpart. Congress changed the original exclusive liability provision, § 905, to § 905(a) (without any significant change in wording); and added a new subsection, § 905(b), which abolished the unseaworthiness action for covered employees and substituted a negligence action against the vessel.[13]

Although § 905(b) describes the negligence action therein permitted as one

13. The Committee Report accompanying the 1972 amendments describes the legislative purpose for the amendments, in part, as follows:

> The Committee believes that especially with the vast improvement in compensation benefits which the bill would provide, there is no compelling reason to continue to require vessels to assume what amounts to absolute liability for injuries which occur to longshoremen or other workers covered under the Act who are injured while working on those vessels. In reaching this conclusion, the Committee has noted that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. The rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other non-seamen working on board a vessel while it is in port.
>
> Accordingly, the Committee has concluded that, given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits.
>
> The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "non-delegable duty", or the like.
>
> Persons to whom compensation is payable under the Act retain the right to recover damages for negligence against the vessel, but under these amendments they cannot bring a damage action under the judicially-enacted doctrine of unseaworthiness . . . .
>
> . . . .
>
> Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.
>
> . . . .
>
> The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in *Reed v. S. S. Yaka,* 373 U.S. 410 [83 S.Ct. 1349, 10 L.Ed.2d 448] (1963) and *Jackson v. Lykes Bros. Steamship Co.,* 386 U.S. 731 [87 S.Ct. 1419, 18 L.Ed.2d 488] (1967), held that the unseaworthiness remedy is available to the injured employee. The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel. The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen or ship builders or repairmen as apply when an independent contractor employs such persons.
>
> H.R.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, 4698, 4703–05.

against the "vessel as a third party," three circuits, including the Fifth, have held that the § 905(b) remedy is available to a covered employee even when the vessel on which his injuries occurred was owned or operated [14] by his employer. *Smith v. M/V Captain Fred*, 546 F.2d 119 (5th Cir. 1977); *Napoli v. Hellenic Lines*, 536 F.2d 505 (2d Cir. 1976); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *contra, Baker v. Pacific Far East Lines*, 451 F.Supp. 84 (N.D.Cal. 1978).

■ The question remains, however, whether Longmire, who was covered by the LHWCA through the adoption of that Act by the OCSLA, is entitled to pursue an action under § 905(b) against his employer. Sea Drilling cites our decision in *Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422 (5th Cir. 1977), rev'd on other grounds 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), for the proposition that the LHWCA compensation provision adopted by the OCSLA constitutes "the exclusive remedy of [an employee] against his employer." 545 F.2d at 432 n.11. Although that statement was correct when our decision in *Higginbotham* was rendered, *M/V Captain Fred* had not then risen on the horizon. That dictum in *Higginbotham* applied with equal force to all workers whose rights derived from the LHWCA, not solely to those whose rights to longshoremen's compensation derived from the OCSLA. Thereafter, *M/V Captain Fred* established that in the courts of the Fifth Circuit "an employee [covered by the LHWCA] may sue his employer qua vessel if he was injured as a result of the vessel's negligence." 546 F.2d at 123.

Sea Drilling contends, however, that *M/V Captain Fred* must be limited in its application to those types of workers specifically named in § 905(b): longshoremen, ship repairers, and ship builders.[15] In support of this argument they call upon an ancient rule of statutory construction to the effect that when a statute that has been adopted by a second statute is amended, the amendment is not incorporated automatically in the second statute unless there is legislative intent to do so.[16] We find no merit in this contention.

■ When the Congress that enacted the OCSLA chose to make the compensation provision of the LHWCA applicable to injuries occurring to workers engaged in mineral extraction operations on the Outer Continental Shelf, it clearly intended to place those workers in the same position as longshoremen and other harbor workers with respect to rights of recovery for injuries sustained by them. It is obvious, therefore, that the relevant portion of the OCSLA is, like the LHWCA, an instance of remedial legislation by Congress. We are aware that remedial legislation, particularly in the field of workmen's compensation, must be construed broadly and liberally so as to effectuate fully the legislature's remedial pur-

---

**14.** Section 905(b) directs that the negligence action be brought against the "vessel." The 1972 amendments include the following definition of the term "vessel":

> The term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.

33 U.S.C. § 902(21) (1976).

**15.** We note that the enumeration of classes of employees referred to by Sea Drilling occurs in that portion of § 905(b) which specifically lim-

its access to the negligence action in certain circumstances. No such enumeration is found in § 905(b) with respect to employees to whom the negligence action is extended.

**16.** *See, e. g., Hassett v. Welch*, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 857 (1938); *In re Heath*, 144 U.S. 92, 12 S.Ct. 615, 36 L.Ed. 358 (1892); *Kendall v. United States*, 12 Pet. 524, 9 L.Ed. 1181 (1838); *United States v. Rainwater*, 244 F.2d 27 (8th Cir. 1957), aff'd, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); *Kessler v. Mercur Corp.*, 83 F.2d 178 (2d Cir.), cert. denied, 299 U.S. 576, 57 S.Ct. 40, 81 L.Ed. 424 (1936).

pose. *Industrial Commission of Wisconsin v. McCartin*, 330 U.S. 622, 628, 67 S.Ct. 886, 91 L.Ed. 1140 (1947); *Baltimore & P.S.B. Co. v. Norton*, 284 U.S. 408, 52 S.Ct. 187, 76 L.Ed. 366 (1932). In our view it is evident that the OCSLA makes Longmire a covered employee under the LHWCA; and by its terms § 905(b) applies to any "person covered under this chapter [who is injured] by the negligence of a vessel . . . ."

Our view is amply supported by the decisions in *Director v. Alabama By-Products Corp.*, 560 F.2d 710 (5th Cir. 1977); *Krolick Contracting Corp. v. Benefits Review Board*, 558 F.2d 685 (3d Cir. 1977); and *Director v. Peabody Coal Co.*, 554 F.2d 310 (7th Cir. 1977). In each case the court was confronted with an issue quite similar to the one we face: does the Black Lung Benefits Act of 1972, which adopted portions of the LHWCA's compensation scheme, also incorporate subsequent amendments to the LHWCA? In each case, furthermore, the court was presented with the same norm of statutory construction which is placed before us here by Sea Drilling: an adopting statute does not incorporate a subsequent amendment to the adopted statute unless there is legislative intent authorizing this incorporation. The courts uniformly rejected application of this rule of construction. Instead, they conclude that the Black Lung Benefits Act of 1972 is a statute of general reference, requiring application of the following rule:

> [W]hen a statute adopts the general law on a given subject, the reference is construed to mean that the law is as it reads

thereafter at any given time including amendments subsequent to the time of adoption. This is to be contrasted with adoption by reference of limited and particular provisions of another statute, in which case the reference does not include subsequent amendments.

*Peabody Coal Co., supra*, 554 F.2d at 322.

■ We conclude that this rule of construction is equally applicable to this case. The language of the OCSLA is unmistakable in its indication that it adopts the entirety of the LHWCA: "compensation shall be payable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act." 43 U.S.C.A. § 1333(b) (West Supp.1979). Furthermore, as we have previously noted, Congress intended that persons protected by the OCSLA were to be entitled to the full panoply of remedial provisions available to longshoremen. Because we are convinced that the OCSLA is a general reference statute, we conclude that it incorporates the 1972 Amendments to the LHWCA. Accordingly, we hold that Longmire may pursue a § 905(b) action against Sea Drilling.[17]

The contrary result would only inject a further anomaly into an area of law already fraught with "fine and often intuitively questionable distinctions."[18] For example, were we to accept Sea Drilling's argument that § 905(b) does not apply to workers like Longmire who trace their rights under the LHWCA through the OCSLA, we would preserve on the Outer Continental Shelf precisely the problem Congress sought to eliminate in the 1972 amendments. In *Ber-*

---

17. *Accord, Smith v. Chevron Oil Co.*, 517 F.2d 1154, 1156 (5th Cir. 1975) (LHWCA applies and does not bar negligence action against nonemployer third party by injured Outer Continental Shelf platform worker) (pre-*M/V Captain Fred*); *Meredith v. A&P Boat Rentals, Inc.*, 414 F.Supp. 788 (E.D.La.1976) (§ 905(b)'s prohibition of indemnity agreements applies where injured employee covered through the OCSLA).

We emphasize that Longmire qualifies for the full panoply of LHWCA benefits because he is covered by the extension of that Act to the Outer Continental Shelf contained in the OCSLA. There is no need for a worker like Long-

mire, to whom the OCSLA applies, independently to satisfy the two-fold situs and status test for LHWCA coverage set forth in our decision in *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533, 538 (5th Cir. 1976). Any worker covered under § 1333(b) of the OCSLA is entitled to the workers' compensation remedy of the LHWCA; and all such a worker need show for access to the § 905(b) remedy is that he was injured by the negligence of a vessel.

18. Robertson, *supra* note 8, at 992.

*trand v. Forest Corp.*, 441 F.2d 809 (5th Cir.), *cert. denied*, 404 U.S. 863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971), we noted that an injured Outer Continental Shelf worker "remains free to sue non employer third parties for damages." 441 F.2d at 811 n.2 (citing *Sieracki* and *Watson v. Gulf Stevedore Corp.*, 374 F.2d 946 (5th Cir.), *cert. denied*, 389 U.S. 927, 88 S.Ct. 286, 19 L.Ed.2d 277 (1967)). Applying *Reed v. The Yaka* and *Jackson v. Lykes*, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967), such an employee would presumably also be free to bring that action against an employing shipowner. The action would necessarily be predicated on the theory of unseaworthiness. If Longmire is not entitled to the benefits of the negligence action provided in § 905(b), then he is also not subject to the abolition of the unseaworthiness remedy contained in that section. We think that fidelity to congressional purpose requires the result we reach in this case. With respect to all workers entitled to compensation according to the provisions of the LHWCA, Congress intended to eliminate the unseaworthiness remedy against a vessel and to substitute for it an action based on negligence.

AFFIRMED in part; REVERSED in part; and REMANDED for proceedings not inconsistent with this opinion.