MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2020 ME 144
Docket:       WCB-19-456
Argued:       September 18, 2020
Decided:      December 29, 2020

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

DARLA J. POTTER

v.

GREAT FALLS INSURANCE COMPANY et al.

CONNORS, J.

[¶1]  The question presented in this appeal is whether Darla J. Potter—an aquaculture worker—is a "seaman" within the meaning of the Jones Act, 46 U.S.C.S. § 30104 (LEXIS through Pub. L. No. 116-214).  The answer, based on the facts in this record, is no.

[¶2]  Great Falls Insurance Company appeals from a decision of the Workers' Compensation Board Appellate Division affirming the decree of the Board (*Pelletier*, *ALJ*) granting Potter's petitions for award of compensation for injuries sustained in the course of her employment with Cooke Aquaculture USA, Inc.[1]  Great Falls contends that the Appellate Division erred by applying a

---

[1]  Before the Board and on appeal, Cooke Aquaculture has supported Potter's petitions and opposed Great Falls' position that Potter is a Jones Act seaman.  At oral argument, Great Falls

2

deferential standard of review to the ALJ's decree and by affirming the ALJ's determination that Potter is not a seaman for purposes of the Jones Act. We disagree and affirm the decision.

## I. BACKGROUND

[¶3] The following facts found by the administrative law judge and contained in the Board's decree are deemed final for the purpose of this appellate review. *See Bailey v. City of Lewiston*, 2017 ME 160, ¶ 9 & n.6, 168 A.3d 762; 39-A M.R.S. §§ 318, 322(3) (2020).

[¶4] Potter worked as a marine technician for Cooke Aquaculture's offshore saltwater salmon farming operation in Eastport for twenty-five years. As a marine technician, her primary job was to care for the salmon, which were raised in cages located less than one mile offshore. Potter's duties consisted of tending, feeding, and harvesting the fish, as well as cleaning, maintaining, and repairing the pens and nets. The job was physically demanding, requiring her to tend salmon cages that were 300 feet in circumference and to stand for hours on pipes that bobbed up and down in the ocean.

---

explained that it insures Cooke Aquaculture for workers' compensation claims but that Cooke Aquaculture has a different insurer for Jones Act coverage.

[¶5] To feed the salmon, Potter occasionally spent time on a "feed barge," which was a large blue box anchored to the ocean floor for years at a time. The feed barge had no means of self-propulsion or running lights for navigation, and a tow boat was required to move it. Because the feed barge could not move under its own power, a large motorized barge was used to transport the feed to the feed barge.

[¶6] To reach the salmon cages, Potter traveled by either the large motorized barge or a twenty-four-foot skiff. The ride took approximately thirty minutes in each direction. While aboard the transportation vessels, Potter was a crew member engaged in activities associated with being a seaman.[2] On occasion, Potter returned to shore during her work day to get additional supplies or feed, but the time that she spent on the transportation vessels for this occasional trip was offset by other duties that she performed onshore.[3]

---

[2] Potter testified that "crew member" is not a term that she would use but that she occasionally operated the transportation vessels and performed maintenance on them when necessary, such as repairing a cable or propeller and changing the oil. She explained that it was advantageous to know how to operate the transportation vessels in case of an emergency and to be able to repair the vessels in the event that they stopped running while out on the water.

[3] Potter testified that she typically worked offshore all day but that, in an average week, she may work onshore for three to four hours, gathering feed and nets. She further testified that, after the salmon are harvested, the cages must remain fallow for at least one year. Potter explained that, during these fallow periods, she continued to work on the cages, cleaning and inspecting them; otherwise, she might work on aquaculture operations in other coves, but, on one occasion, she spent six months onshore preparing rope.

4

Great Falls presented no evidence demonstrating that Potter's onshore duties were connected to the maintenance or operation of the transportation vessels.

[¶7]  Potter typically worked between eight and nine hours a day, and 75 percent of her work day was spent undertaking duties associated with the salmon cages.  According to the ALJ, Potter's testimony that less than 30 percent of her working hours were spent working on a vessel was "entirely credible." No evidence was presented regarding how much time Potter spent on the feed barge.

[¶8]  In November 2015, Potter slipped on a pipe connected to the salmon cages, and her left knee struck a hard surface.  She continued to work on the salmon cages until January 2017, when the progressive worsening of her knee's condition prevented her from working on the salmon cages, and she was given an onshore job.

[¶9]  Potter filed petitions seeking compensation for the November 2015 sudden injury and the January 2017 gradual injury.  Great Falls opposed both petitions, raising the affirmative defense that the Board lacked subject matter jurisdiction because Potter was a "seaman" pursuant to the Jones Act, 46 U.S.C.S. § 30104, and was therefore not an "employee" entitled to benefits pursuant to the Workers' Compensation Act, 39-A M.R.S. § 102(11) (2020).

[¶10] In 2018, the ALJ held a two-day hearing at which it heard testimony from Potter and another Cooke Aquaculture employee and admitted documentary exhibits, including photographs, medical records, and certain employment-related forms. In its decision, the ALJ acknowledged that the parties had agreed to certain stipulations of fact and law, including that the salmon cages were not "vessels" for purposes of the Jones Act.[4] Based on these stipulations and evidence admitted at the hearing, the ALJ concluded that Great Falls had failed to establish that Potter was a Jones Act seaman and granted Potter's petitions. Great Falls filed a motion for further findings of fact and conclusions of law, which the ALJ denied.

[¶11] Great Falls appealed the ALJ's decision to the Appellate Division and requested that it review the ALJ's decision de novo, citing *Dorr v. Maine*

---

[4] Although the Board's decree reflects that it accepted the parties' stipulations, there is no evidence of the stipulations in the record. At oral argument, the parties confirmed that they had agreed to certain stipulations. In the absence of a written stipulation from the parties, the ALJ described one stipulation as an agreement that, in order for the Jones Act to apply, "the worker must spend at least 30 percent of their working hours *on* a 'vessel.' Conversely, a worker who spends less than 30 percent of his/her time *in service of* a vessel in navigation does not qualify as a 'seaman' under the Jones Act." (Emphasis added.) As discussed in this opinion, the difference between time spent *on* versus *in service of* a vessel might matter in determining whether the Jones Act applies, rendering the stipulation as described in the Board's decree unhelpful. Given its imprecision, we treat this "stipulation" as nothing more than an acknowledgment by the parties that the relevant test for determining who is a seaman under the Jones Act is set forth in *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). In contrast, the parties' stipulation that the salmon cages were not "vessels" within the meaning of the Jones Act is precise, with a factual dimension we do not second guess, particularly in the context of our limited review. *See* 39-A M.R.S. § 322(3) (2020); M.R. App. P. 23(b)(3). The best practice for parties wishing to enter into a stipulation is to either file a written stipulation signed by the parties or their attorneys or orally enter the stipulation on the record.

*Maritime Academy*, 670 A.2d 930 (Me. 1996). The Appellate Division declined Great Falls' request, stating that the issue of whether Potter was a seaman pursuant to the Jones Act is a mixed question of fact and law and that its review of factual findings was limited to ensuring that the findings were supported by competent evidence. *See* 39-A M.R.S. § 321-B(2) (2020). The Appellate Division further stated, "Because we do not possess superior expertise than the ALJ in evaluating the claimant's status as an employee or a seaman, we apply our ordinary standard of review, as set forth in *Pomerleau*." *See Pomerleau v. United Parcel Serv.*, 464 A.2d 206 (Me. 1983).

[¶12] The Appellate Division concluded that the ALJ's finding that Potter spent less than 30 percent of her working hours on or in service of a vessel was supported by competent evidence in the record. Although Potter spent some amount of time on the feed barge, the Appellate Division declined to address the ALJ's conclusion that the feed barge was not a vessel because there was no evidence in the record indicating how much time Potter spent on the feed barge, and, therefore, Great Falls had failed to sustain its burden of proof on that issue. With less than 30 percent of her documented time spent on a vessel, the Appellate Division agreed with the ALJ's conclusion that Potter was not a Jones Act seaman and affirmed.

[¶13]   We granted Great Falls' petition for appellate review.   *See* 39-A M.R.S. § 322 (2020); M.R. App. P. 23.

## II.  DISCUSSION

A.   Standard of Review

[¶14]   The central issue in this appeal is whether Potter's claims fall within the jurisdiction of federal admiralty law or state workers' compensation law.  As a preliminary matter, however, Great Falls contends that the Appellate Division erred by applying a deferential standard of review to the ALJ's factual findings and legal conclusions because our holding in *Dorr* required the Appellate Division to review the Board's decree de novo.  Great Falls likewise urges us to undertake a de novo review of the record.

[¶15]   Great Falls interprets our holding in *Dorr* too broadly.  Whether a worker is a "seaman" as that term is used in the Jones Act is a "mixed question of law and fact."  46 U.S.C.S. § 30104; *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995); *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991).  In *Dorr*, we stated that "[t]he issue of whether an employee falls within the exclusive jurisdiction of a federal statute does not involve an interpretation of the Workers' Compensation Act, nor does it fall within the [Board's] traditional area of expertise," so we conduct an "independent review."  670 A.2d at 932

8

(citing *LeBlanc v. United Eng'rs & Constructors Inc.*, 584 A.2d 675, 677 (Me. 1991)).

[¶16] By "independent review," we did not mean a de novo review of the facts and law. *Id.* This point is clear from our citation in *Dorr* to *LeBlanc*. In *Leblanc*, the issue was whether the full faith and credit owed to a prior New Hampshire award barred the Maine Workers' Compensation Commission from granting disability benefits. 584 A.2d at 677-78. In answering in the negative, we stated that, in our review of the Commission's decision for errors of law only, we defer to its expertise. *Id.* Given that its expertise is limited to the Maine Workers' Compensation Act, however, "we conduct an independent review of the jurisdictional requirements imposed by the United States Constitution." *Id.* at 677. Thus, this aspect of our recitation of the standard of review in *Dorr*, as in *LeBlanc*, stands merely for the proposition, applied with respect to most administrative decisions by state governmental bodies, that we defer to their reasonable construction of the statutes that they administer and review other legal issues de novo. *See Reed v. Sec'y of State*, 2020 ME 57, ¶ 14, 232 A.3d 202 ("[W]e defer to the agency's reasonable construction when the agency is tasked with administering the statute and it falls within the agency's expertise.").

[¶17]   In the workers' compensation context, moreover, our role on appeal, like the Appellate Division's role, is limited by statute.  *See* 39-A M.R.S. §§ 318, 321-B(2), 322(3); M.R. App. P. 23(b)(3).   Although we review the Appellate Division's interpretation of federal law de novo, "in the absence of fraud, [the ALJ's decision] on all questions of fact is final."  39-A M.R.S. § 318; *accord Bailey*, 2017 ME 160, ¶ 9 & n.6, 168 A.3d 762; *Huff v. Reg'l Transp. Program*, 2017 ME 229, ¶ 9, 175 A.3d 98.

[¶18]   In sum, because the question of whether a worker is a seaman within the meaning of the Jones Act is a mixed question of law and fact, we accept the ALJ's findings of fact.  We review de novo, with no deference to either the Board or the Appellate Division, the application of federal law to these facts.

B.      Seaman Status

[¶19]  Pursuant to the Workers' Compensation Act, the term "employee," identifying those covered by the Act, excludes "[p]ersons engaged in maritime employment . . . who are within the exclusive jurisdiction of admiralty law or the laws of the United States."  39-A M.R.S. § 102(11)(A)(1).  Hence, a "seaman" within the meaning of the Jones Act, 46 U.S.C.S. § 30104, is precluded from receiving protection from the state statute.  *See Dorr*, 670 A.2d at 932 ("It is generally   understood   that   the   Jones   Act   supersedes   state   workers'

compensation laws applicable to seamen."); *Chandris,* 515 U.S. at 356 (stating that an injured worker who does not qualify as a seaman pursuant to the Jones Act "may still recover under an applicable state workers' compensation scheme").

[¶20]  "The Jones Act, however, does not define the term 'seaman' and therefore leaves to the courts the determination of exactly which maritime workers are entitled to admiralty's special protection."  *Chandris,* 515 U.S. at 355.  Although the Supreme Court's test has evolved over the years, the term "seaman" is generally understood to refer to a "master or member of a crew of any vessel."  *Dorr*, 670 A.2d at 932 (quotation marks omitted); *see also Wilander*, 498 U.S. at 355 ("The key to seaman status is employment-related connection to a vessel in navigation."); *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 553-55 (1997) (affirming the importance of a substantial connection between an employee and a vessel in navigation when determining seaman status).

[¶21]  In *Chandris*, the Supreme Court set forth a two-part test for determining seaman status:

> First, . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission.  The Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work.  But

this threshold requirement is very broad: All who work at sea in the service of a ship are *eligible* for seaman status.

Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.  The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

515 U.S. at 368 (alteration, citations, and quotation marks omitted).

[¶22]  Regarding the temporal element in the "most important" second part of the test, the general rule is that an employee who spends less than 30 percent of her time on or in service of a vessel in navigation does not qualify as a seaman.  *Id.* at 368, 371; *see also Dorr*, 670 A.2d at 933 (concluding that an engineer who spent 25 percent of his working hours onboard a research vessel was not a Jones Act seaman).

[¶23]  Here, the ALJ found, and the record reflects, that Potter spent less than 30 percent of her time on the transportation vessels.  On this record, and with the limited scope of our review, we cannot disturb the ALJ's findings to add any of the time Potter spent on the feed barge or salmon cages to the

calculation of time spent on a Jones Act vessel.  *See* 39-A M.R.S. § 322(3); M.R. App. P. 23(b)(3).

[¶24]  Great Falls' arguments as to why this factual finding is not dispositive can be divided into two categories.  First, Great Falls argues that time that Potter spent onshore preparing the transportation vessels and offshore working on the feed barge should have counted toward meeting the 30 percent threshold.  Second, more broadly, Great Falls defines "in service of a vessel" to include the time that Potter worked on the cages, because, in its view, the "mission" of the transportation vessels was to tend to the salmon, and all the time Potter that spent offshore advanced this mission.  In support of this view, Great Falls notes that when Potter was on the water—whether on a transportation vessel, the feed barge, or the cages a mile out at sea—she was exposed to the perils of the sea.

[¶25]  With respect to the first argument, we cannot adjust the ALJ's finding upward to climb past 30 percent because any additional time related to occupying or serving a vessel is not quantified in the record, and we cannot disturb the ALJ's findings of fact.  *See* 39-A M.R.S. § 322(3); M.R. App. P. 23(b)(3); *Bailey*, 2017 ME 160, ¶ 9 & n.6, 168 A.3d 762.

[¶26] The second argument is more invocative of our role in applying the federal law to the ALJ's factual findings. From a legal perspective, the 30 percent threshold is neither a strict bright line nor necessarily dispositive in isolation. *Chandris*, 515 U.S. at 371; *Dorr*, 670 A.2d at 933. Judicial authority is virtually nonexistent as to whether aquaculture workers should be deemed Jones Act seamen and is almost as sparse in indicating how broadly to identify the "mission" of a vessel. *Chandris*, 515 U.S. at 368 (quotation marks omitted).

[¶27] The closest analogy to the instant situation in the case law may be to workers transported daily to offshore oil drilling operations. The analogy is imperfect for many reasons, but generally speaking, if work is performed on a non-vessel, such as a work platform affixed to the sea bed, then no court appears to have considered the time spent achieving the objective of the non-vessel, e.g., drilling for oil, to be a part of the mission of the vessel transporting the worker to the non-vessel.[5] *See generally* 14 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 146.02 (2020).

---

[5] Although much of the case law addressing the status of offshore oil workers applied a pre-*Chandris* test developed by the Fifth Circuit Court of Appeals, that test also considered whether a worker's activities contributed to the accomplishment of a vessel's mission. *See Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959); *see also Chandris*, 515 U.S. at 365-66. In the absence of the worker's activity taking place on a vessel itself, none of this case law contemplates that oil-drilling activity on a non-vessel was the mission of any vessel. *See, e.g., Barrios v. Engine & Gas Compressor Servs., Inc.*, 669 F.2d 350, 353-54 (5th Cir. 1982) (concluding that a worker was not a seaman where the compressor stations on which he worked were not Jones Act vessels and there was no showing that the worker's transportation on and contribution to the functioning of crew boats moving from

14

[¶28] Also, although a worker on a non-vessel platform in the water is exposed to the elements of the sea, she is not engaged in a traditional sea-centric occupation. Just as one might drill for oil on land or on the sea, so also can the activity in which Potter was engaged—fish farming—be accomplished on land as well as on the sea. Notably, the Maine Workers' Compensation Act expressly contemplates that at least some aquaculture workers will fall within its application. *See* 39-A M.R.S. §§ 102(3), 401(1)(B)-(C) (2020).

[¶29] An occupation that can occur on land as well as on the sea does not in itself exempt a worker from Jones Act seaman status. For example, a cook on a ship can be a seaman. *See Me. Mar. Acad. v. Fitch*, 411 F. Supp. 3d 76, 79-84 (D. Me. 2019); *Wilander*, 498 U.S. at 343-44. But such a cook is easily deemed to engage in "the ship's work" and serves the ship itself. *Chandris*, 515 U.S. at 368 (quotation marks omitted). The same cannot be said for someone who spends the bulk of her time essentially engaged in farming activities on non-vessels in the sea.

---

platform to platform was anything "other than transitory and incidental to his employment as a mechanic on the compressor stations"); *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1346-47 (5th Cir. 1980) (rejecting a claim that a worker was a Jones Act seaman because the worker "indicated that his primary responsibilities concerned drilling operations on the drilling rig and platform, and that most of his work aboard the tender was only incidental thereto").

[¶30] Each case is fact-sensitive, and there may be situations in which an aquaculture worker might be deemed a seaman. *See generally* Timothy E. Steigelman, *The Jones Act Fish Farmer*, 33 Hawaii L. Rev. 223 (2010). Considering the facts of this case, and in the absence of any authority to the contrary, we deem the mission of the transportation vessels here to be to transport workers and not the broader task of fish farming. Although the ALJ found that Potter was a crew member on the transportation vessels and that she engaged in seaman-related activities, the ALJ concluded that her "primary job was not to work as a crewman on a boat, but to work on the salmon pens; tending, feeding, harvesting the fish, and cleaning, maintaining, and repairing the pens and nets." On this record, we conclude that the finding that Potter spent less than 30 percent of her time associated with vessel-centric activities is dispositive. She is not a seaman within the purview of the Jones Act, and the decision of the Appellate Division is affirmed.

The entry is:

Judgment affirmed.

Joshua Birocco, Esq., and Chelsea Suvlu, Esq. (orally), Tucker Law Group, Bangor, for appellant Great Falls Insurance Company

Kevin M. Noonan, Esq. (orally), McTeague Higbee, PA, Topsham, for appellee Darla J. Potter

Michael Tadenev, Esq., and Ryan P. Dumais, Esq. (orally), Eaton Peabody, Ellsworth, for appellee Cooke Aquaculture USA, Inc.

Workers' Compensation Board Appellate Division case number 19-0004
FOR CLERK REFERENCE ONLY