830 F.2d 1332
 92 A.L.R.Fed. 707, 23 Fed. R. Evid. Serv. 1353
 KERR-McGEE CORPORATION, Plaintiff,
v.
MA-JU MARINE SERVICES, INC., et al., Defendants.
Dorothy E. LYONS, Plaintiff-Appellee, Cross-Appellant,
v.
KERR-McGEE CORPORATION, Defendant-Third Party
Plaintiff-Appellant-Cross- Appellee,
v.
MA-JU MARINE SERVICES, INC., Defendant-Appellee.
 No. 85-3661.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 30, 1987.
Rehearing and Rehearing En Banc Denied Dec. 2, 1987.
 
 A. Wendel Stout, III, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff-appellee, cross-appellant.
 Michael L. McAlpine, Martin L. Grayson, New Orleans, La., for Lloyd's.
 Darryl J. Carimi, James C. Klick, Carimi Law Firm, Gretna, La., for Lyons.
 Jon D. Picou, Bailey & Leininger, Metairie, La., for Ma-Ju Marine.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG, REAVLEY, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 This case is a maritime personal injury action by appellee-cross-appellant Dorothy Lyons (Lyons) against her employer, appellant-cross-appellee Kerr-McGee Corporation (Kerr-McGee), and appellee Ma-Ju Marine Services, Inc. (Ma-Ju), the owner and operator of the vessel on which Lyons was injured while it was under time-charter to Kerr-McGee. Lyons sought recovery from Ma-Ju and Kerr-McGee under section 5(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Sec. 905(b), and against Kerr-McGee also under the Jones Act, 46 U.S.C. Sec. 688. The district court directed a verdict in favor of Kerr-McGee on the Jones Act claim, and rendered judgment on the jury verdict awarding Lyons recovery against Kerr-McGee, but not against Ma-Ju, on her section 5(b) claim. Lyons and Kerr-McGee each appeal.
 
 Facts and Proceedings Below
 
 2
 Kerr-McGee employed Lyons as a switcher in the Breton Sound Gas Field off the Louisiana coast. In this offshore field there are several fixed platforms surrounded by scattered oil and gas wells and well head structures. The switchers conduct assorted tests at the well sites to ensure that the oil and gas are flowing freely. Through various charter arrangements, Kerr-McGee hired boats to transport the switchers and other workers from well to well. Kerr-McGee had time-chartered the vessel on which Lyons was injured, the C.C. RIDER, from Ma-Ju. The C.C. RIDER had only one crew member--the captain--and, as is customary in time-charter arrangements, he was a regular employee of the boat's owner, Ma-Ju.
 
 
 3
 On July 4, 1982, Lyons was seriously injured in a fall from the C.C. RIDER's cabin deck to the main deck. As the boat drew near a well site, Lyons proceeded to descend steps leading to the main deck. As she was doing so, the boat lurched and threw her on her back, causing significant injuries and severe pain. Lyons began receiving LHWCA compensation payments from Kerr-McGee.[1]
 
 
 4
 This litigation began when Kerr-McGee sought reimbursement from Ma-Ju and its insurer for LHWCA compensation paid to Lyons. Sometime later, Lyons filed suit directly against Kerr-McGee, Ma-Ju, and Ma-Ju's insurers.[2] Lyons claimed that her injuries were caused by the negligence of Ma-Ju and Kerr-McGee in failing to use nonskid paint on the C.C. RIDER's steps and in failing to provide adequate handrails along them; she also asserted that the steps were too steep and that a piloting error caused the C.C. RIDER to lurch. Lyons sought recovery as a Jones Act seaman or, in the alternative, under section 5(b).
 
 
 5
 The district court, concluding that the evidence established as a matter of law that Lyons was not a seaman, granted KerrMcGee's motion for directed verdict on Lyons' Jones Act claim. Her section 5(b) claims were submitted on special interrogatories to the jury, which found that Kerr-McGee "exercise[d] control" over the C.C. RIDER, that Kerr-McGee was negligent, that Ma-Ju was not, and that Lyons was fifty percent contributorily negligent and suffered $262,500 damages. Judgment was entered on the verdict that Lyons recover $131,250 from Kerr-McGee but take nothing from Ma-Ju. Kerr-McGee appeals complaining, inter alia, that there is no evidence that it, a time-charterer, was guilty of any vessel negligence so as to be liable under section 5(b). Lyons appeals complaining of the directed verdict against her on seaman status for Jones Act purposes and of various asserted trial errors. We sustain Kerr-McGee's appeal and reject Lyons'.
 
 Discussion
 I. Seaman Status
 
 6
 Lyons sought to establish that she was a Jones Act seaman. Determining seaman status is "an inherently factual question" and thus is "generally a question for the fact-finder." Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir.1986) (en banc). Nonetheless, if the requisite proof is absent, a court may decide that seaman status is lacking as a matter of law. Id. at 1074; White v. Valley Line, Co., 736 F.2d 304, 305 (5th Cir.1984); Wallace v. Oceaneering International, 727 F.2d 427, 432 (5th Cir.1984); Dove v. Belcher Oil Co., 686 F.2d 329, 334 (5th Cir.1982). A trial court may "enter a directed verdict where the record demonstrates that reasonable persons could not draw conflicting inferences which might lead to another conclusion." Theriot v. Bay Drilling Corp., 783 F.2d 527, 532 (5th Cir.1986). The decisional developments leading to this Circuit's test for seaman status have been described on many occasions, and we will not retrace that history here. See generally Barrett, 781 F.2d at 1069-74; Robertson, A New Approach to Determining Seaman Status, 64 Texas L.Rev. 79 (1985). Seaman status is a jury question if there is evidence that (1) the plaintiff was "assigned permanently to a vessel ... or performed a substantial part of his work on the vessel," and (2) the work he performed assisted the vessel in accomplishing its mission or contributed to the function or maintenance of the vessel. Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir.1959) (emphasis added). Barrett reaffirmed Robison and made clear that under the first prong we must examine the entire course of the plaintiff's employment, not just the particular responsibilities he carried at the time of injury. 781 F.2d at 1076. See also In re Patton-Tully Transportation Co., 797 F.2d 206, 210 (5th Cir.1986).
 
 
 7
 Based on the evidence presented, there is no reasonable basis on which a jury could have found that Lyons was a seaman.[3] As for the first Robison prong, the testimony clearly showed that Lyons was assigned to fixed platforms, which are not vessels. See Barrios v. Engine & Gas Compressor Services, Inc., 669 F.2d 350, 353 (5th Cir.1982); Bernard v. Binnings Construction Co., 741 F.2d 824, 828-29 (5th Cir.1984); Robertson, supra, at 100. Lyons worked seven days on, seven days off. When she was working, she lived on an offshore, fixed platform. All of her job responsibilities related to well sites at other fixed locations. Her only contact with the boats occurred when they ferried her from one job site to the other. The vessels were nothing more than "maritime taxi[s]," Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1372 (5th Cir.1983), and Lyons' relationship to them was scarcely more significant than that existing between a land-based taxi and its passenger. As we noted concerning the purported seaman in the analogous case of Munguia v. Chevron Co., U.S.A., 768 F.2d 649, 653 (5th Cir.1985), cert. denied, 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), Lyons "was not assigned to a fleet of vessels"--or indeed, to the C.C. RIDER, which she rarely rode--but "instead the vessels were ... assigned to" her "merely [as] a means ... to transport ... [her] ... to the various places where ... [her] platform work was to be done."
 
 
 8
 Even though she was not assigned to a vessel, Lyons could meet the first prong of the Robison test if she performed "a substantial part of [her] work on the vessel." 266 F.2d at 779. This would require her to show she worked on the boat "with at least some degree of regularity and continuity." Bertrand v. International Mooring & Marine, Inc., 700 F.2d 240, 246 (5th Cir.1983), cert. denied, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984) (quoting Barrios v. Engine & Gas Compressor Services, Inc., 669 F.2d 350, 353 (5th Cir.1982)). Lyons did not perform any of her job-related duties on the ferry boats, except to "sometimes" receive on the boat radio messages from Kerr-McGee as to what was to be done at a well site she was working on. The evidence suggested that she occasionally helped the pilot by tying the boat to the platform, or helped clean it, but testimony at trial also established that minor aid such as this was extended as a courtesy, and not as a part of her duties as an employee. In any event, Lyons' on-board assistance and her receipt of radio messages clearly did not amount to a substantial part of her work.[4]
 
 
 9
 Our conclusion necessarily follows from Munguia. Noel Munguia was a "jack of all trades" performing various duties for Chevron. Chevron maintained several boats for its employees to use in transporting themselves to offshore work sites. Munguia was injured at an offshore well. The jury found that he was a seaman, apparently because he piloted a boat from platform to platform. The trial court rendered judgment notwithstanding the verdict because there was no basis for the jury's determination that Munguia was a seaman. Id. at 651. We affirmed because Munguia's duties were platform-related, not vessel-related:
 
 
 10
 "Although he did some incidental work that contributed to the maintenance and operation of the vessels, his primary duties were neither to pilot nor to maintain the boats nor to use them as a place of work. He used them only as a mean of getting to and from his work on platforms and other structures." Id. at 653.
 
 
 11
 Indeed, Munguia presented a stronger case for seaman status than does Lyons. See also Barrios, 669 F.2d at 353-54. That Lyons was injured while on the vessel does not change the result. Longmire, 610 F.2d at 1347.
 
 
 12
 Lyons relies heavily on Coulter v. Texaco, Inc., 714 F.2d 467 (5th Cir.1983), a case in which we affirmed the district court's summary judgment that plaintiff was a seaman. Coulter is inapposite, however. Curtis Coulter was a roustabout employed by Texaco, Inc. in its Lafitte Field. As in this case, workers necessarily traveled in the field by boat. But the vessel was much more than a means of transportation for Coulter. "The uncontradicted facts demonstrate that the roustabouts frequently performed their work on the deck of the vessels.... Indeed, on the day of Coulter's injury, he had performed part of his duties on the vessel...." Id. at 469. Unlike Coulter, Lyons performed none of her job-related duties on board the C.C. RIDER. This important factual distinction renders Coulter inapposite here. Munguia, which we find controlling, also distinguished Coulter on this basis. 768 F.2d at 653-54. Other Coulter-like cases are similarly inapposite.[5]
 
 
 13
 Lyons does not meet the first prong of Robinson. As the Robinson prongs are conjunctive, that ends the matter. We also observe that there was no substantial evidence that Lyons' job-related duties contributed in any material manner to the mission of the vessel.
 
 
 14
 We agree with the district court that the evidence could not support a jury finding that Lyons was a seaman.
 
 II. LHWCA Claims
 
 15
 As previously observed, see note 1, supra, Lyons was covered under the LHWCA and received compensation thereunder from Kerr-McGee, her employer. In addition to her Jones Act claim, Lyons also sued Kerr-McGee, time-charterer of the C.C. RIDER, for vessel negligence as authorized by section 5(b) of the LHWCA. We now consider whether the district court erred in overruling Kerr-McGee's motion for directed verdict and for judgment n.o.v. on Lyons' section 5(b) claim on the ground that as a time-charterer Kerr-McGee was not guilty of or responsible for any of the vessel negligence shown.
 
 
 16
 Section 5 (now section 5(a)) of the original 1927 Act expressly stated that LHWCA compensation was the exclusive remedy for covered employees against their employer. However, the combined effect of two prominent Supreme Court cases--Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)--undermined this exclusivity in some circumstances by permitting an injured longshoreman to bring an unseaworthiness action against the shipowner, who was then permitted to bring an indemnity action against the stevedore employer. See generally Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 1620-21, 68 L.Ed.2d 1 (1981); G. Gilmore & C. Black, The Law of Admiralty, Sec. 6-46 at 410-11 (1975). Two subsequent Supreme Court cases pushed Sieracki-Ryan a step further by permitting a longshoreman to bring an unseaworthiness claim against the shipowner even if the shipowner was also his employer. Reed v. Steamship Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); Jackson v. Lykes Bros. Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967). Reed and Jackson rested on the notion that a longshoreman employed by the shipowner should have the same remedies as those employed by third parties. This was where matters stood when Congress amended the Act in 1972.
 
 
 17
 In the 1972 amendments, Congress retained the exclusivity provision--section 5--as new section 5(a), and added subsection (b), which permits covered employees to sue the "vessel" for its negligence, but overrules that part of Sieracki that allowed unseaworthiness claims. See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2757, 61 L.Ed.2d 521 (1979). Furthermore, section 5(b) overrules Ryan by prohibiting the "vessel" from bringing an indemnification claim against the employer. See Edmonds, 99 S.Ct. at 2757.
 
 
 18
 A leading treatise took the view that Congress also intended to overrule Reed, G. Gilmore & C. Black, supra, Sec. 6-57 at 450. However, this Court held that Reed-type actions, though limited to claims of employer vessel negligence, survived the 1972 amendments. Smith v. M/V Captain Fred, 546 F.2d 119 (5th Cir.1977). The Supreme Court endorsed this position in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). Noting that section 5(b) specifically prohibits a longshoreman from suing his vessel/employer if his injuries are caused by the negligence of others providing such services to the vessel,[6] the Court reasoned that this language would be unnecessary if Congress intended to bar all negligence suits by employees against the vessel/employer. Id. at 2547. The Court also relied on the legislative history of the 1972 amendments, which indicated approval for Reed 's rationale: covered employees who are paid by the "vessel" should have the same range of remedies against it as their counterparts employed by third parties. Therefore, because section 5(b) allows third-party employed longshoremen to sue for "vessel" negligence, that same remedy is also available to longshoremen directly employed by the "vessel."
 
 
 19
 Section 2(21) of the LHWCA defines "vessel" as meaning the vessel upon or in connection with which a covered employee is injured in the course of his employment, "and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. Sec. 902(21). Although "time-charterer" is not specifically mentioned in the definition, we have held that it is included. Helaire v. Mobil Oil Co., 709 F.2d 1031, 1041 (5th Cir.1983). See also Balfer v. Mayronne Mud & Chemical Co., Inc., 762 F.2d 432, 435 (5th Cir.1985). Contra: Amox v. Barge # ATB99, 587 F.Supp. 1529 (D. Alaska 1984); Keller v. United States, 557 F.Supp. 1218 (D.N.H.1983).
 
 
 20
 Since Lyons, an LHWCA-covered employee, was injured on the C.C. RIDER while in the course of her employment, and since Kerr-McGee was then the time-charterer of the C.C. RIDER, Kerr-McGee is subject to suit for negligence by its employee Lyons under section 5(b), notwithstanding section 5(a)'s exclusivity provision. However, the conclusion that section 5(b) removes from Lyons' suit against Kerr-McGee the exclusivity bar of section 5(a) does not fix the contours of Kerr-McGee's potential negligence liability.
 
 
 21
 We recently reiterated that "when it enacted Sec. 905(b), Congress did not create a new or broader cause of action in admiralty than that which previously existed...." Richendollar v. Diamond M Drilling Co., Inc., 819 F.2d 124, 125 (5th Cir.1987) (en banc). As we said in Parker v. South Louisiana Contractors, Inc., 537 F.2d 113, 117 (5th Cir.1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977), respecting section 5(b) third-party actions, "section 905(b) eliminates only an injured worker's right to bring actions against third parties based on unseaworthiness, and preserves his right under prior law to recover for third party negligence." (Emphasis added.) Again, in Russell v. Atlantic & Gulf Stevedores, 625 F.2d 71, 72 (5th Cir.1980), we addressed the same topic, stating, "Section 905(b) did not create a new negligence cause of action but merely preserved an injured worker's right to recover damages from third parties in accordance with nonstatutory negligence principles...." (Emphasis added.) In other words, section 5(b) eliminated unseaworthiness, and did not expand negligence liability.
 
 
 22
 Further, as other decisions have made clear, section 5(b) did not even fully preserve the negligence action. To begin with, the suit allowed by section 5(b) is for injuries "caused by the negligence of a vessel ... against such vessel." As applied to a defendant which is a "vessel" under section 2(21) because it is the vessel's owner, the section 5(b) liability is "only for negligence in its 'owner' capacity." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 2547 n. 6, 76 L.Ed.2d 768 (1983) (emphasis added). See also Tran v. Manitowoc Engineering Co., 767 F.2d 223, 226, 227 (5th Cir.1985) (same; vessel owner liable under section 5(b) "only for vessel owner negligence" or "only for its negligent acts as barge owner"); Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789, 795 (2d Cir.1979) ("in order to determine whether a shipowner-employer may be held liable" under section 5(b) "a court must decide if the negligence that caused the accident was 'owner occasioned' "). By a parity of reasoning, Kerr-McGee, which is a vessel under section 5(b) only because it was the vessel's time-charterer, is subject to liability under section 5(b) only for negligence in its "time-charterer" capacity.
 
 
 23
 As we understand it, this means that where a defendant is subject to suit for negligence under section 5(b) solely by reason of having been the time-charterer of the vessel on which the LHWCA-covered plaintiff was injured in the course of her employment, the duties and responsibilities against which the claim of the defendant's negligence must be measured are necessarily limited to those which arise out of and are founded on the relationship which the time-charter establishes between the defendant and the vessel. Such duties and responsibilities of the time-charterer are not enhanced under section 5(b) because the plaintiff is an employee of the defendant injured in the scope of her employment. Castorina v. Lykes Brothers S.S. Co., Inc., 758 F.2d 1025, 1033 (5th Cir.), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). Nor are such duties and responsibilities of the time-charterer, and its consequent potential negligence, otherwise any greater in the context of a section 5(b) suit than in other contexts, for as we have noted section 5(b) did not expand negligence liability. Indeed, the Court's opinion in Scindia counsels against a broad reading of the duties arising out of a defendant's relationship to the vessel for purposes of section 5(b) negligence liability. There the Court explained:
 
 
 24
 "Cases holding the vessel liable on the ground that it owed nondelegable duties to protect the longshoremen from injury were rejected [citing by footnote portions of the legislative history of the 1972 amendments]. It would be inconsistent with the Act to hold, nevertheless, that the shipowner has a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process. Such an approach would repeatedly result in holding the shipowner solely liable for conditions that are attributable to the stevedore, rather than the ship. True, the liability would be cast in terms of negligence rather than unseaworthiness, but the result would be much the same." Id., 101 S.Ct. at 1623 (emphasis added; footnote omitted).[7]
 
 
 25
 Moreover, a time-charterer cannot be liable under section 5(b) unless it is negligent, and it is a fundamental precept of tort law that there can be no negligence unless there is first a duty. This principle is well ensconced in section 5(b) jurisprudence. See, e.g., Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 214 (5th Cir.1984) (sustaining summary judgment that shipowner was not liable for harm caused by defective scaffolding because shipowner had no duty to intervene); Ducote v. International Operating Co., 678 F.2d 543, 546 (5th Cir.1982) (barge owner was not liable as a matter of law to plaintiff who fell off a rickety ladder because the owner had no duty to provide safe ladders; this was the responsibility of the independent cleaning contractor that employed plaintiff); Bess v. Agromar Line, 518 F.2d 738, 742 (4th Cir.1975) (affirming dismissal of longshoreman's section 5(b) claim against the shipowner because "there was no evidence of any duty on the shipowner to provide dunnage under the facts of this case").
 
 
 26
 Lyons does not claim that Kerr-McGee was guilty of any affirmative or active negligence, or that it did anything which created or brought about or maintained a dangerous condition. Lyons claims that her fall was caused by the C.C. RIDER's lack of both adequate handrails and nonskid-type paint or surfacing on its steps, the fact that its steps were too steep, and the captain's having negligently caused or allowed the vessel to hit the platform as Lyons was descending the steps. The captain was clearly Ma-Ju's employee. There is no evidence or claim that Kerr-McGee had anything to do with the construction, design, or maintenance of the C.C. RIDER, its steps or handrails, or that it had ever caused or required them to be in the condition they were in when Lyons was injured, or that it ever prevented or discouraged Ma-Ju, the vessel's owner and operator, from changing or correcting those matters.
 
 
 27
 The question, then, is whether in these circumstances Kerr-McGee had the duty to see to it that the mentioned conditions of the vessel were corrected. The answer lies in the traditional allocation of responsibility between a time-charterer and ship, as modified by the contract between Kerr-McGee and Ma-Ju. As will be shown, both custom and agreement left control over and responsibility for the C.C. RIDER's condition solely in the hands of Ma-Ju.[8]
 
 
 28
 In the traditional time-charter arrangement, the charterer directs the commercial activities of the boat, but
 
 
 29
 "the owner's people continue to navigate and manage the vessel.... The time charter is used where the charterer's affairs make it desirable for him to have tonnage under his control for a period of time, without undertaking the responsibilities of ship navigation and management or the long-term financial commitments of vessel ownership." G. Gilmore & C. Black, supra, Sec. 4-1, at 194.
 
 
 30
 "Possession and control remain with the owner and the ship is operated by its regular crew, but the charterer determines the ship's routes and destinations." Migut v. Hyman-Michaels Co., 571 F.2d 352, 355 (6th Cir.1978). "Generally ... a time charterer, one who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." Mallard v. Aluminum Co. of Canada, Inc., 634 F.2d 236, 242 n. 5 (5th Cir.), cert. denied, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). The Second Circuit has commented, "Under the time charter, the owner bears continuing responsibility for the seaworthiness of the vessel." Nichimen Co. v. M.V. FARLAND, 462 F.2d 319, 331 (2d Cir.1972). It is well-established that the time-charterer is not responsible for navigational errors committed by the pilot. See, e.g., Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1372 (5th Cir.1983); Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445, 451 (5th Cir.1987) ("Navios-Charterer, a time charterer, cannot be held responsible for the presumed negligence of any Navios-Owner employees aboard the vessel ..."). Moreover, it has been held that time-charterers do not have responsibility for conditions such as those that allegedly caused Lyons' injury. See Migut, 571 F.2d at 356 (holding that the owner, not the time-charterer, was liable for damages suffered by a longshoreman who fell through an uncovered deck hatch).
 
 
 31
 Certainly the time-charterer has some responsibilities. It designates the cargo that the chartered vessel will carry, and if, for example, it carelessly chooses an unsafe combination of cargo to share the same hold, it could be liable for resulting damages. The time-charterer directs where and when the vessel will travel, so if it forces it out in hurricane weather or similarly treacherous conditions, it may be liable under section 5(b). See Helaire, 709 F.2d at 1039. See also Graham v. Milky Way Barge, Inc., 811 F.2d 881, 892-93 (5th Cir.1987). But its duties are determined by tradition and agreement.
 
 
 32
 The charter agreement between Kerr-McGee and Ma-Ju does not alter the traditional allocation of duties and control in any presently relevant manner. In fact, the agreement makes clear that the parties contemplated that the owner-operator would be responsible for the condition of the vessel. Paragraph Three states in part:
 
 
 33
 "The Vessel shall be, at the time of delivery, tight, staunch, strong, seaworthy and in good running order ... and said Vessel shall have sufficient equipment, furniture, furnishings, tackle, apparel and appliances for the services contemplated hereunder. During the term of this Charter, Owner at its own cost and expense, shall maintain the Vessel and her equipment, apparel and appliances in as good condition and in as good working order and repair as said Vessel was in at the time of delivery to Charterer...."[9]
 
 
 34
 Under the provisions of the charter, it is clear that maintaining the safety of the vessel's deck and stairs was the sole responsibility of Ma-Ju. Nor did actual operations under the agreement indicate otherwise. The vessel had been under charter from Ma-Ju to Kerr-McGee since 1980, and there was no evidence that prior to Lyons' fall Kerr-McGee had ever exercised or assumed any control in this regard. Indeed, Ma-Ju, without being told by Kerr-McGee to do so or what to accomplish thereby, had reconditioned the C.C. RIDER, including repainting the deck and stairs in 1982, a few months before the incident in question. The agreement did provide that "Owner agrees to promptly replace the Master, any officer, or any member of the crew upon the request of the Charterer" and that "Charterer shall have the right to install on the Vessel any additional gear or equipment for loading, carrying or discharging cargo or passengers, or for towing or for accommodation of the crew, or other services beyond that on board at the beginning of this Charter (including but not by way of limitation, radio equipment)." However, except for the furnishing of radio equipment to communicate with its employees concerning their platform work, there is no evidence that Kerr-McGee ever exercised or attempted to exercise its rights under these provisions. Moreover, the provisions in question do not purport to impose any duty on Kerr-McGee, or relieve Ma-Ju of any of its responsibilities; nor do they relate to the complained of conditions respecting the railing and surface of the steps.
 
 
 35
 The essential thrust of Lyons' argument is that Kerr-McGee had sufficient economic power so that, as a practical matter, Ma-Ju would have done anything in reason that Kerr-McGee requested concerning the condition of the vessel, in order to keep the charter arrangement. This may well be so. The charter was "on a day to day basis," and we may assume that it was far more significant to little Ma-Ju than to big Kerr-McGee. Some confirmation of this may be reflected in the evidence proffered by Lyons, but rejected by the district court, that after the accident Ma-Ju added another railing on the steps because the captain of another vessel under charter to Kerr-McGee by a corporation under common ownership with Ma-Ju told a principal of Ma-Ju that one or more unidentified Kerr-McGee employees had, following the accident, made statements to the effect that there should have been an additional railing. When asked on deposition if in adding the railing in these circumstances "you were doing what you felt Kerr-McGee wanted because you wanted to keep this contract?" the Ma-Ju principal replied, "Right."[10] We do not believe, however, that the mere existence of this sort of economic power on the part of Kerr-McGee imposes a section 5(b) duty on it. Essentially, Lyons' argument in this connection comes down to an assertion that Kerr-McGee owed Lyons, as its employee, the nondelegable duty to provide Lyons a safe place to work. This is, in effect, to impose on Kerr-McGee a duty in its capacity as employer, rather than as time-charterer, contrary to Castorina. Kerr-McGee's duty to provide Lyons a safe place to work is subsumed within her worker's compensation rights under the LHWCA. Moreover, as Scindia suggests by analogy, to impose on Kerr-McGee such a nondelegable duty, even though "cast in terms of negligence," would have "much the same result" as making it liable in a capacity other than its capacity as time-charterer.
 
 
 36
 Kerr-McGee's status as a time-charterer distinguishes this case from prior cases allowing suits against employers under section 5(b). Those cases involve true shipowners, bare boat charterers, or owners pro hac vice.[11] Three Supreme Court cases highlight this. In Reed, the defendant/employer was a bare boat charterer. The differences between a bare boat charter and a time-charter are plain on reading the Court's description of the bare boat charter:
 
 
 37
 "Under such arrangements full possession and control of the vessel are delivered up to the charterer for a period of time. The ship is then directed by its Master and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit. It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner pro hac vice.... [B]arring explicit statutory exemption, the bareboat charterer is personally liable for the unseaworthiness of a chartered vessel...." Reed, 83 S.Ct. at 1351-52 (emphasis added; footnotes omitted).
 
 
 38
 In Jackson, the defendant/employer was the true owner of the vessel, and in Pfeifer (the case which held that Reed-type actions survived the 1972 amendments) the defendant/employer was the owner pro hac vice of the vessel.
 
 
 39
 This pattern is present in the circuit court decisions that hold the employer liable.[12] However, in cases where the defendant's legal relationship to the vessel does not impose the right and duty of control, no section 5(b) liability attaches. The facts of Bossard v. Port Allen Marine Service, Inc., 624 F.2d 671 (5th Cir.1980), are illustrative. Donald Bossard was employed by Port Allen, a "gas-freeing" facility operating on the Mississippi River. While freeing gas from an Exxon barge, he inhaled toxic fumes and died. Bossard's estate, widow, and children ultimately sought recovery from Port Allen under section 5(b). We rejected this claim because Port Allen was not owner pro hac vice of the barge from which the fumes emanated. Because Port Allen had been hired only to free gas from the barge, it "did not have the complete control ... required for ownership pro hac vice." Id. at 673. See also Hess v. Port Allen Marine Service, Inc., 624 F.2d 673 (5th Cir.1980) (same); Trussell, 753 F.2d at 368 (shipbuilder/employer did not have unrestricted use of vessel required of ownership pro hac vice and was thus not liable under section 5(b)); Balfer, 762 F.2d at 435 (denying plaintiff who slipped on boat deck a section 5(b) recovery because defendant had no control over the boat decks); Haluapo v. Akashi Kaiun, K.K., S.A.M., Inc., 748 F.2d 1363 (9th Cir.1984) (affirming district court holding that time-charterer did not have a duty to maintain boat winches and was thus not liable).
 
 
 40
 There should not be reactive immunity for time-charterers simply because their relationship to the vessel does not rise to the level of owner pro hac vice. Neither, however, should there be automatic imposition of liability on time-charterers merely because they are "vessels" under the Act. Instead, we focus on the legal control and responsibility imposed by the particular relationship, and this analysis applies to each type of party defined as a "vessel" in section 2(21). See Turner, 651 F.2d at 1306 n. 5 (distinguishing a case that absolved a time-charterer of liability because "the negligence found by the jury [in this case] occurred in the course of precisely those operations for which the time-charterer had assumed contractual responsibility").
 
 
 41
 We hold that a time-charterer is not liable under section 5(b) unless the cause of the harm is within the charterer's traditional sphere of control and responsibility or has been transferred thereto by the clear language of the charter agreement. See Mallard, 634 F.2d at 242 n. 5 (noting that this Circuit "seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect"). Inasmuch as Kerr-McGee was not responsible for maintaining the safety of the C.C. RIDER's deck, either by custom or agreement, Lyons has no section 5(b) claim against it as a matter of law.
 
 III. Trial Rulings
 
 42
 Our disposition of the two primary issues in this case makes it unnecessary to discuss most of the other issues that Lyons raises. However, we will address Lyons' objections to certain of the district court's evidentiary rulings and to its comments during her closing argument.
 
 
 43
 A. Exclusion of Evidence of Subsequent Remedial Measures
 
 
 44
 Lyons objected to the district court's exclusion of three pieces of evidence: (1) photographs of the C.C. RIDER taken after the installation of an additional handrail; (2) testimony by a Kerr-McGee supervisor regarding whether a handrail was added to the C.C. RIDER after the accident; (3) the testimony by a co-owner of Ma-Ju regarding its post-accident addition of a handrail to the C.C. RIDER (see note 10 and accompanying text, supra ).
 
 
 45
 Our holding that as a matter of law Kerr-McGee had no duty to correct conditions on the C.C. RIDER's deck disposes of the argument that the evidence should have been admitted to prove control. As we stated earlier, the fact that Kerr-McGee may have had the economic leverage to, as a practical matter, extract changes in the vessel's deck does not alter our holding that it had no duty to do so. Even with the complained of excluded evidence, Lyons' section 5(b) case against Kerr-McGee would still have been fatally deficient.[13] Accordingly, as to Kerr-McGee, Lyons presents no ground for reversal in respect to these evidentiary rulings.
 
 
 46
 As to Ma-Ju's negligence, the evidence was clearly inadmissible under Fed.R.Evid. 407.[14] We also observe that the defendants stipulated as to the feasibility.
 
 
 47
 Lyons argues that the evidence was admissible to impeach the testimony of Kerr-McGee's supervisor, LeBlanc, that he considered the C.C. RIDER safe. We hold that the district court did not abuse its discretion in excluding the evidence for this purpose. LeBlanc was initially called as a witness by Lyons under the adverse witness rule and admitted that in a Kerr-McGee form accident report which he filled out concerning the incident he wrote, "install hand rails on steps and no-skid surface on each step" in the blank introduced by the words "briefly state your opinion as to what action if any could prevent recurrence of similar incidents."[15] After LeBlanc admitted this, he was asked by Lyons' counsel whether he considered that the handrails and nonskid surface he mentioned in the report "would have been necessary to make" the C.C. RIDER "safe for your men to use." LeBlanc replied in the negative. He had not previously testified to any opinion on this subject. LeBlanc was already "impeached" by the accident report he had made out and his admissions concerning it, all of which was before the jury. The fact that Ma-Ju subsequently in fact added a handrail, or nonskid surfacing, would not further impeach LeBlanc, particularly as there was no evidence that he directed Ma-Ju to do so. Even if the fact of subsequent repair theoretically had some slight incremental impeachment value, the district court was well within its discretion in concluding that any such value was outweighed by the risk of confusion and undue prejudice.[16]
 
 
 48
 Lyons also contends that evidence that Ma-Ju subsequently added the handrail was admissible as tending to negate her contributory negligence. We doubt that it had a sufficiently significant probative tendency to do so such that we could say the district court abused its discretion in excluding the evidence. See note 16, supra. In any event, since the jury found Ma-Ju was not negligent and since we have held that Kerr-McGee was entitled to a directed verdict (and would have been even if the complained of excluded evidence had been admitted), the question of Lyons' contributory negligence is immaterial.
 
 
 49
 We conclude that the complained of evidentiary rulings present no reversible error.
 
 B. Comments During Closing Argument
 
 50
 During closing argument, Lyons' counsel referred to LeBlanc's accident report as an admission by Kerr-McGee that the C.C. RIDER was dangerous. The district court broke in and admonished the jury to give such weight to the report as it deemed appropriate and not to feel bound by its conclusions. In light of the district court's earlier explanation to the jury of its important role as independent fact finder, its interruption and unfortunately lengthy comments were arguably unnecessary. As an initial proposition, and viewing the matter on the cold record, we might have been inclined to proceed in another fashion had we presided at trial. However, we did not preside, the district court has the right to comment on the evidence, and we do not reverse on this ground unless it abuses its discretion. Bass v. International Brotherhood of Boilermakers, Local 582, 630 F.2d 1058, 1064-65 (5th Cir.1981). We are unable to find any reversible error in the present circumstances. Under Rule 407, the only legitimate value of the report was as impeachment of LeBlanc, and not as substantive evidence of fault. See notes 14 & 15, supra. The district court was entitled to take measures to see to it that this evidence was not misused by the jury. See note 16, supra. Here the district court's comments merely stressed that the jury was to make its own mind up on the substantive fault issues; the comments did not denigrate the significance of the report as impeachment evidence.
 
 Conclusion
 
 51
 We affirm the district court's ruling that there was insufficient evidence to present a jury question on the issue of Lyons' seaman status. We hold that Kerr-McGee had no duty to require Ma-Ju to correct alleged defects in the C.C. RIDER's deck, and that as a matter of law Kerr-McGee is not liable under section 5(b). We further hold that neither the district court's evidentiary rulings nor its comments on the evidence present grounds for reversal.
 
 
 52
 Accordingly, we affirm judgment in favor of Ma-Ju; and we reverse the judgment in favor of Lyons and against Kerr-McGee, and remand for entry of judgment in favor of Kerr-McGee.
 
 
 53
 AFFIRMED in part; REVERSED in part and REMANDED.
 
 
 
 [1]
 As Lyons' injuries occurred as a result of operations conducted on the outer continental shelf within the meaning of 43 U.S.C. Sec. 1333(b), the Outer Continental Shelf Lands Act (OCSLA), she is by virtue thereof entitled to LHWCA compensation and is treated as a covered employee (and Kerr-McGee as an employer) under the LHWCA. See Longmire v. Sea Drilling Corp., 610 F.2d 1342 (5th Cir.1980)
 
 
 [2]
 Jurisdiction was based on diversity, the Jones Act, and admiralty. The cases were consolidated. They were handled on the law rather than the admiralty side of the docket. No party complains of this. Kerr-McGee does not complain on appeal of the district court's denial of its claims against Ma-Ju and its insurers
 
 
 [3]
 We decide the seaman status issue within the same analytical framework that the district court decided it and Kerr-McGee and Lyons have presented it here and below, and without any special reference to Lyons being an LHWCA-covered employee. We recognize that we have held that those longshoremen and harbor workers, including ship repairers, shipbuilders, and ship breakers, directly covered by the LHWCA are for that reason ineligible for consideration as seamen or members of the crew of a vessel entitled to claim Jones Act benefits respecting the same thus covered employment. Pizzitolo v. Electro-Coal Transfer Corp., 812 F.2d 977 (5th Cir.1987). We need not here determine whether Pizzitolo applies to offshore oil workers, such as Lyons, who are covered under the LHWCA only by virtue of the OCSLA (see note 1, supra ), as we hold Lyons is not a seaman irrespective of her LHWCA coverage
 
 
 [4]
 On two occasions during the year she was employed by Kerr-McGee prior to her injury, Lyons had "steered" one of the boats transporting her, but neither occasion involved the C.C. RIDER (one was a crew boat, the other a lugger similar to the C.C. RIDER) and on each occasion it obviously was simply as a courtesy (once at her request, once at the captain's) and not a part of the duties of her job
 
 
 [5]
 See Patton-Tully, 797 F.2d at 210 (affirming determination that plaintiff was a seaman because plaintiff, who drowned when a skiff overturned, performed a substantial portion of his work aboard vessels); Bertrand, 700 F.2d at 246 (reversing summary judgment for defendant where plaintiffs performed ninety percent of their work aboard vessel); Landry v. Amoco Production Co., 595 F.2d 1070, 1073 (5th Cir.1979) (reversing jury finding of no seaman status where plaintiff, injured while jumping from one barge to the other, "spent 70% of her time in vessel-related work activities")
 
 
 [6]
 Section 5(b) likewise included, as a result of the 1972 LHWCA amendments, an analogous provision respecting those providing shipbuilding or repair services to the vessel; in 1984, however, that provision was amended so that the LHWCA-covered providers of those services cannot sue their employer under section 5(b) with respect to injuries occurring after September 28, 1984
 
 
 [7]
 We have noted "that Scindia narrowed the scope of liability allowed under our previous cases." Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 216 (5th Cir.1984). See also Helaire, 709 F.2d at 1038-39
 
 
 [8]
 Scindia, the leading case describing the negligence standards that apply in a section 5(b) action, does not set the duty of time-charterers. Though the Supreme Court used the word "vessel" throughout its opinion, the context of the case, as well as the Court's alternate use of "shipowner," suggest that the duties prescribed in Scindia apply only to true owners or other parties with similar dominion over the boat. The Court was not using "vessel" in its broader, section 2(21) sense. Cf. Tran v. Manitowoc Engineering Co., 767 F.2d 223, 228 (5th Cir.1985) (citing Scindia for the proposition that "[t]he Supreme Court has ... articulated the basic duties owed by a vessel owner to a longshoreman") (emphasis added)
 
 
 [9]
 Other portions of the agreement include the following provisions:
 "The actual performance and operations, navigation, management and control of the Vessel shall at all times be done by Owner, under its command and control....
 "....
 "Owner, at its expense and by its own procurement, shall, during the terms of this Charter, man, navigate, operate and supply the Vessel as may from time to time be necessary for the operation of the Vessel in accordance herewith.... Owner shall maintain all required licenses for said Vessel and its equipment in accordance with the applicable governmental regulations. Owner shall employ a skilled Master, properly ticketed and qualified under Coast Guard and governmental laws and regulations, and a complete crew as required for the operation of the Vessel, provided the same shall be not less than a crew of one ."
 
 
 [10]
 We observe that the proffered evidence does not show that Kerr-McGee was attempting to dictate to Ma-Ju. So far as concerns Kerr-McGee, the proffered testimony was double hearsay; the Kerr-McGee employee was not identified; and there is no indication that the statement by this employee was a direction to Ma-Ju, as opposed to a mere expression of opinion
 
 
 [11]
 An owner pro hac vice has unrestricted use of the vessel. Trussell v. Litton Systems, Inc., 753 F.2d 366, 368 (5th Cir.1984), overruled in other respects in Richendollar, supra
 
 
 [12]
 See, e.g., Captain Fred, 546 F.2d at 120 (employer/defendant was the true owner of the vessel); Longmire v. Sea Drilling Corp., 610 F.2d 1342 (5th Cir.1980) (same); Tran v. Manitowoc Engineering Co., 767 F.2d 223 (5th Cir.1985) (same); Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31 at 35 (3rd Cir.1975) (employer/defendant was owner pro hac vice of the vessel); Napoli v. Hellenic Lines, Ltd., 536 F.2d 505, 506 (2d Cir.1976) (same); cf. Ducote, 678 F.2d at 544, n. 1 ("[T]his court has held that, if the employer is the owner pro hac vice of the vessel upon which the employee is injured, the employee may sue his employer qua vessel ... under section 905(b)." )
 
 
 [13]
 As previously observed (see note 10, supra ), the excluded evidence was not competent to show that Kerr-McGee exercised control or told Ma-Ju to do anything, but merely that Ma-Ju was willing, after the accident, to make changes it thought Kerr-McGee wanted
 
 
 [14]
 See 10 Moore's Federal Practice Sec. 407.03 at IV-154:
 "Relevancy and policy considerations provide the rationale for the exclusion of evidence of subsequent remedial measures. These are measures 'which, if taken previously, would have made the event less likely to occur.' These will include measures as diverse as the activities of man. For example, discharge of the employee responsible for the accident, subsequent repair, change in operational procedures or rules, installation of a safety device, subsequent design change, elimination of a hazardous condition." (Footnote omitted.)
 
 
 [15]
 The form reflects that it is for internal Kerr-McGee use and is to be filled out within forty-eight hours of each accident in which any Kerr-McGee employee suffers a job-related injury. There is no evidence that the completed form went to any party other than Kerr-McGee. The completed form itself was also introduced into evidence by Lyons
 
 
 [16]
 See 10 Moore's Federal Practice Sec. 407.02 at IV-153:
 "Yet the trial judge has broad power to insure that remedial measures evidence is not improperly admitted under the guise of the 'other purposes' exception. He can assess the prejudicial effect of such evidence; and be reasonably certain before admitting it that it does have substantial probative value on the issue on which it is introduced and that this issue is genuinely in dispute. Further, a limiting instruction on the use of such evidence can be helpful. And if the trial judge concludes that factors of undue prejudice, confusion of issues, misleading the jury or waste of time outweigh the probative value of the evidence, he may exclude the evidence under Rule 403." (Footnotes omitted.)