**Mr. & Mrs. Noel MUNGUIA, Plaintiffs-Appellants,**

**v.**

**CHEVRON COMPANY, U.S.A., et al., Defendants-Appellees.**

**No. 84–3235.**

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1985.

Rehearing and Rehearing En Banc Denied Sept. 30, 1985.

---

Silvestri & Massicot, Frank A. Silvestri, John P. Massicot, New Orleans, La., for plaintiffs-appellants.

Lloyd C. Melancon, New Orleans, La., for defendants-appellees.

Before RUBIN, RANDALL, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue is whether an oil field roustabout who works on platforms and uses various small vessels chosen at random from a larger number available to travel to and from the platforms and to carry his tools and equipment is a seaman within the meaning of the Jones Act. We hold that such a roustabout is not assigned more or less permanently to a vessel or a fleet of vessels; the various vessels are instead assigned to him. Nor does the roustabout perform a substantial part of his work on the vessels. The vessels are but a means to enable him to perform his own platform-related mission. Therefore, the roustabout is not a member of the crew of a vessel or fleet of vessels and is not entitled to invoke the Jones Act.

I.

Noel Munguia had been employed by Chevron Company as a roustabout or, as his brief puts it, "jack of all trades," for nine years. At the time he was injured, he was assigned to work as a relief pumper-gauger in Chevron's South and Southwest Pass oil field and had been assigned to this or similar work for two years. This field includes about 200 producing oil wells, which have been drilled in an area eighteen miles long on both sides of the Mississippi River and only a short distance from the river. Each well is situated on a stationary platform, built in the marsh or on water. Each platform is accessible only by water. We review the evidence concerning his status in the light most favorable to Munguia, as the jury's verdict in his favor requires, relying only on his own testimony, the other evidence he presented, his brief, and a few uncontradicted and undisputed matters.

Munguia worked for seven days, then was off duty for seven days. When on duty he was provided sleeping quarters and meals in a bunkhouse. Near the bunkhouse Chevron had a group of oil storage tanks, called a tank battery. A number of vessels, varying from eight to twelve, were anchored at the tank battery. This flotilla included small boats of various kinds (such as Lafitte skiffs, Boston whalers, and Jo-boats) fitted with outboard motors and other small vessels that could transport one or

two workers and their equipment. There was also at least one larger vessel, a wire-line barge, aboard which equipment needed for work on wells was permanently stored. This vessel was transported to a well when wire-line work on the well was required. Chevron maintained this small fleet for the sole purpose of enabling its employees to service the production field.

Each day Munguia was assigned to duty at various places in the field. If he was not assigned to work at the tank battery but to work on the various wells, Munguia took a boat, either alone or with another worker, and visited a number of the multiple small platforms within the field. He loaded onto the boat the tools and equipment he would need for the day and then navigated the boat to and from the various platforms. At each platform he unloaded the tools and equipment needed to do the work required at that platform. He testified that he spent ninety percent of his time "in the water," apparently referring both to his transportation to and work on fixed platforms and other structures as being "in the water."

Munguia was required from time to time to clean the boats and to do minor maintenance work on them such as changing wheels or propellers. Chevron's witnesses testified without contradiction that Munguia spent only five to six percent of his working hours doing maintenance work on the boats. On one occasion, he worked on the wire-line barge when it was being used to raise a sunken Jo-boat.

On the day he was injured, Munguia was assigned to work with a senior employee who was a gas specialist. They were to check a number of wells for gas leaks. They proceeded in a Lafitte skiff to a number of wells, checking the valves on the well-control unit (called a Christmas tree) for leaks. One of them would close the valve and the other would listen for leaks. Munguia was injured while attempting to close a frozen master valve.

Munguia's suit was first dismissed by summary judgment. We reversed and remanded for trial because we found that an affidavit filed by Munguia created a genuine issue of material fact concerning his status as a seaman.[1] In his affidavit, he said that "more than 90% of his activities involved piloting and making up these Jo-Boats by himself."[2] This we considered a "critical assertion."[3] Despite the fact that the nature and location of Munguia's work was a principal issue in the case, the testimony adduced by both parties on this issue at the later trial is sparse, amounting all together to no more than a few pages of transcript. Although Munguia testified that he spent ninety percent of his time "in the water," his testimony and the other evidence, examined in the light most favorable to him, did not support his earlier assertion that he performed most of his work piloting and maintaining the vessels.

After trial on the merits, the jury found that Munguia was a "seaman" and rendered judgment in his favor for $425,000 and in favor of his wife for loss of consortium of $50,000. The district judge then entered judgment n.o.v. and, alternatively, for a new trial, finding no basis for the jury's verdict that Munguia was a seaman.

## II.

While the Jones Act[4] uses the term "seaman" to define the workers entitled to its benefits, the term has been narrowed, as a result of the enactment of the Longshoremen's and Harbor Workers' Compensation Act, to members of the crew of a vessel.[5] The difference is significant for not every maritime worker or person exposed to nautical perils is now covered. The classic test

1. *Mungia v. Chevron Company, U.S.A.*, 675 F.2d 630 (5th Cir.1982).

2. *Id.*, at 631.

3. *Id.*

4. 46 U.S.C. § 688.

5. 33 U.S.C. §§ 901, 903; 1 M. Norris, The Law of Seamen §§ 18, 19 (3d ed. 1970), and authorities cited therein; *Senko v. La Crosse Dredging Corporation*, 352 U.S. 370, 371, 77 S.Ct. 415, 416, 1 L.Ed.2d 404, 406 (1957).

to determine whether a worker has offered evidence sufficient to warrant a jury verdict that he is a crew-member was set forth in *Offshore Company v. Robison*.[6] Judge Wisdom's opinion for this court states that a jury case is made:

> (1) if there is evidence that the injured workman was assigned permanently to a vessel ... or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.[7]

We have since expanded the term "vessel" to include an identifiable fleet of vessels in addition to a single vessel,[8] but "the relationship between the individual and an identifiable vessel or group of vessels must be substantial in point and time, not spasmodic.... The key is that there must be a relationship between the claimant and a specific vessel or identifiable group of vessels."[9] Relying on this criterion, in *Guidry v. Continental Oil Company*,[10] we rejected the worker's claim to Jones Act status because his assignment to any particular vessel was "random." "At no time was he assigned to work on a particular rig on a continuing or regular basis."[11] "[T]he relationship," we said in *Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, "be- tween the individual and the several identifiable ships must be substantial in point of time and work."[12]

■ Whether a worker is a crew-member who meets the criteria for crew-member status is ordinarily a jury question.[13] The jury's verdict must be weighed in a balance that gives utmost weight to the worker's evidence and the presumptions and inferences logically deducible from that evidence.[14] A directed verdict or judgment n.o.v. for the employer is proper only when there is no reasonable evidentiary basis for a jury's verdict that the worker was a seaman.[15]

■ The jury might have found that, as contended by Munguia, his work required the ability to pilot a small boat and "more than rudimentary" knowledge of the operation and maintenance of the craft; that he had to know about currents in the river to navigate properly; and that he faced the vicissitudes of storm, injury, and death while on the waters he travelled. But these are not the specific criteria by which it is determined that a worker is a member of the crew of a vessel. The *Robison* criteria are three-fold: whether the worker performs a substantial amount of his work aboard a vessel; whether he is assigned more or less permanently to a vessel or identifiable fleet of vessels; and whether his work duties contribute to the mission of the vessel.

---

**6.** 266 F.2d 769, 779 (5th Cir.1959).

**7.** *Id.*, at 779.

**8.** *Ardoin v. J. Ray McDermott and Co.*, 641 F.2d 277, 281 (5th Cir.1981); *Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir.1979); *Bazile v. Bisso Marine Co., Inc.*, 606 F.2d 101, 104 (5th Cir.1979); *Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523 (5th Cir.1960).

**9.** *Guidry v. Continental Oil Co.*, 640 F.2d 523, 529 (5th Cir.1981).

**10.** *Id.*

**11.** *Id.*

**12.** 280 F.2d 523, 528 (5th Cir.1960).

**13.** *Barrios v. Louisiana Construction Materials Company*, 465 F.2d 1157 (5th Cir.1972). *See* 1 M. Norris, The Law of Seamen § 20 (3d ed. 1970), and authorities cited therein.

**14.** *Wiley v. Offshore Painting Contractors, Inc.*, 711 F.2d 602, 610 (5th Cir.1983).

**15.** *Wallace v. Oceaneering Intern.*, 727 F.2d 427, 432 (5th Cir.1984), citing *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). *See also Senko v. La Crosse Dredging Corporation*, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957); *Grimes v. Raymond Concrete Pile Company*, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958); *Butler v. Whiteman*, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958).

Munguia's work fails to meet at least two of these criteria: (1) he was not assigned to a fleet of vessels; instead the vessels were randomly assigned to him as a means of performing his work of servicing platforms and (2) he did not perform a substantial part of his work on the vessels. The various boats were merely a means of transportation. They constituted in effect a boat pool, a nautical motor pool, from which he daily selected or was assigned a boat to enable him to transport himself and his equipment to the various places where his pumping, gauging, or other platform work was to be done.

Munguia was assigned to work for seven days at Chevron's tank battery and bunkhouse, then he was daily assigned to work on specific platforms, either alone or as an assistant to the pumper-gauger. He described his duties this way:

> As a roustabout with Chevron, I'm supposed to help—I help assist the pumper gauger. I do paper work, because the pumper gauger, he is in charge. He trained me and he's supposed to leave the tank battery. I'm the man in charge. I'm responsible to take care of these wells, installations, make any repairs or whatever. Sometimes there's a contract roustabout sent out to us, and most of the time I used to supervise these, me being the company roustabout.

To perform these duties he "operates a boat, changes the choke on the well, repairs and maintains the equipment, starts—loads and unloads compressors, takes care of generators, change[s] oil, make[s] tests, make[s] reports, clerical work, a little bit of everything. He's a jack of all trades." Although he did some incidental work that contributed to the maintenance and operation of the vessels, his primary duties were neither to pilot nor to maintain the boats nor to use them as a place of work. He used them only as a means of getting to and from his work on platforms and other structures. The evidence did not show that he performed a substantial part of his work on the vessels.[16]

Munguia seeks to differentiate his assignment from those in which platform workers have been found not to be crew members on the basis that those cases involved single large platforms,[17] whereas he was assigned daily to many small platforms. The nature of a platform does not change because of its size. The principal difference between the work of those litigants and Munguia's is the amount of water travel involved, but whether the worker travels to one or two or many platforms, water travel alone does not make a worker a crew member.

The mission of the Chevron fleet is to transport workers and their tools to the platforms in the field. The function of these boats was materially different from that of the vessels considered in *Coulter v. Texaco, Inc.*,[18] for the vessels there involved were "special purpose vessels," "specifically constructed to store and carry tools, pipe, or any other equipment necessary to the roustabouts' work."[19] They "were equipped with power tools, cranes and other devices designed to allow the roustabouts to maintain the Lafitte field,"[20] and all of the necessary equipment was carried on the vessels at all times. Indeed, the roustabouts frequently performed their work on the decks of those vessels. Those vessels were "much more than mere sources of transportation. They provide[d] the tools, equipment, and location for much of the work associated with

16. See, e.g., Barrios v. Engine and Gas Compressor Services, Inc., 669 F.2d 350 (5th Cir.1982); Longmire v. Sea Drilling Corp., 610 F.2d 1342 (5th Cir.1980).

17. Billings v. Chevron, U.S.A., Inc., 618 F.2d 1108 (5th Cir.1980); Owens v. Diamond M Drilling Company, 487 F.2d 74 (5th Cir.1973). Compare Longmire v. Sea Drilling Corp., 610 F.2d 1342 (5th Cir.1980).

18. 714 F.2d 467 (5th Cir.1983).

19. Id. at 469.

20. Id.

Texaco's operation of the Lafitte field." [21] Furthermore, the employer in *Coulter* had only two of these special purpose vessels. Coulter was always assigned to one or the other, and, we concluded, "assigned permanently to one of Texaco's two vessels, performed substantial work aboard these vessels, and contributed to the function of these vessels." [22]

*Landry v. Amoco Production Company* [23] provides no greater support for Munguia's position. Landry was an oilfield roustabout who spent seventy percent of her time in vessel-related activities, working with the same crew at the same site reachable only by boat. She was injured attempting to jump from one barge to another. While she had land-related duties on a compression station platform, she also had specific water-related duties as a welder's helper on the barge. Munguia, on the other hand, had no regular work duties aboard any vessel. The worker in *Ardoin v. J. Ray McDermott and Company,* [24] of whom we said, reversing a summary judgment, that the facts might support a reasonable inference that he had a permanent connection with a fleet of derrick barges, performed part of his duties on the barge, ate and slept there, and operated equipment attached to the barge while working on the platform. Munguia had no such connections with the assemblage of Jo-boats, Lafitte skiffs, Boston whalers, and the single wireline barge on which he worked at best only sporadically.

*Munguia I* does not, as Munguia asserts, so fix the law of the case as to preclude the later determination made by the district court. We there cautioned, "[o]ur decision is in no way a forecast of the proper outcome of the case on motion for instructed verdict at the end of the plaintiffs' case, any renewal at the end of the defendant's case, or at the conclusion of all of the evidence, or upon a motion for j.n.o.v. after receipt of an adverse jury verdict." [25]

Moreover, the facts proved at trial, interpreted most charitably to Munguia, do not support the assertion relied upon in *Munguia I* that "90% of his activities involved piloting and making up these Jo-Boats by himself."

Fairly read, the record does not contain the slight evidence that would suffice to warrant a jury verdict that Munguia was a crew member and thus preclude the district court's judgment n.o.v.

For these reasons the judgment is AFFIRMED.

21. *Id.*

22. *Id.*

23. 595 F.2d 1070 (5th Cir.1979).

24. 641 F.2d 277, 281 (5th Cir.1981).

25. *Mungia v. Chevron Company, U.S.A., supra* n. 1, 675 F.2d at 633.