695 So.2d 1097 (1997)
Paula CAPPIELLO, Wife of/and James L. Cappiello
v.
EXXON CORPORATION.
No. 96-CA-2418.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1997.
*1098 Robert H. Wood, Jr., Thomas Kelly Wetzel, New Orleans, for Defendant-Appellant Exxon Corporation.
George Pivach, II, Pivach & Pivach, Belle Chasse, for Plaintiffs-Appellees Paula and James L. Cappiello.
Before CIACCIO, JONES and WALTZER, JJ.
*1099 JONES, Judge.
James Cappiello and his wife, Paula Cappiello brought this action against Exxon under the Jones Act and general maritime law to recover damages arising from injuries plaintiff sustained as a result of three accidents which occurred during his employment.[1] Following a bench trial, the trial court rendered judgment in favor of plaintiff and awarded $759,906.92 in damages.
On appeal, defendants cite several errors by the trial court: (1) finding plaintiff is a seaman under the Jones Act; (2) finding defendant was negligent and proximately caused plaintiff's injuries; and (3) finding the vessel used by plaintiff was unseaworthy under general maritime law.

SEAMAN STATUS
The Jones Act provides special protection for a maritime worker who qualifies as a "seaman". A "seaman" injured "in the course of his employment" is entitled to bring a cause of action in negligence against his employer. 46 U.S.C.A. § 688(a). However, the Jones Act does not define "seaman" and therefore leaves to the courts the determination of which maritime workers qualify for this status. Chandris, Inc. v. Latsis, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). In Chandris, the Supreme Court gave the most recent explanation of the requirements for Jones Act protection, specifically listing the two characteristics a maritime worker must have to qualify as a seaman: (1) "... an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission" and (2) "... a seaman must have a connection to a vessel in navigation... that is substantial in terms of its duration and its nature." Chandris, 515 U.S. at 368, 115 S.Ct. at 2190. This second requirement was rephrased later in the opinion; "the Jones act remedy is reserved for sea based maritime employees whose work regularly expose them to the `special hazards and disadvantages to which they who go down to sea in ships are subjected.'" Chandris, 515 U.S. at 370, 115 S.Ct. at 2190 (quoting Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)). The court also stated: "... the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time." Chandris, 515 U.S. at 370, 115 S.Ct. at 2191. In addition, the court reiterated its statement from Wilander that "the inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." Chandris, 515 U.S. at 371, 115 S.Ct. at 2191 (quoting McDermott International v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). The court also stated "a worker who spends less than about 30% of his time in the service of the vessel in navigation should not qualify as a seaman under the Jones Act", but the court explained this is merely a rule of thumb to be used as a guideline. Chandris, 515 U.S. at 370-71, 115 S.Ct. at 2191.
A determination of whether the trial court committed manifest error in finding plaintiff qualifies as a seaman requires consideration of plaintiff's duties while working for defendant. Plaintiff worked for defendant for 15 years before receiving a disability retirement in 1994. The injuries which led to plaintiff's retirement occurred while he was performing his job as Senior Operator, a position plaintiff held for approximately the last seven years of his employment. As Senior Operator, plaintiff was responsible for inspecting, testing, and maintaining various wells and tank batteries located off-shore. Plaintiff took daily excursions by boat for this purpose using a Joe boat called the Stingray. During plaintiff's two days off, other Operators would use the Stingray, but the boat was navigated exclusively by plaintiff while he was working. Defendant owned several types of boats used for various purposes and the Stingray was of the type commonly used by Senior Operators. The Stingray was twenty-four to twenty-eight feet *1100 long[2] and powered by a 6-cylinder diesel inboard engine. It was equipped with a hydraulic steering system, running lights, an anchor light, a spot light and a horn, as well as "push knees" on the bow designed for placing the boat against platforms. The steering system was located inside an enclosed cabin, which also housed a cellular phone and a centrifuge. The centrifuge, a machine used to measure the percentage of oil and water contained in the wells, was bolted down on a cabinet where plaintiff stored his tools.
Plaintiff worked five eight-hour days a week, Tuesday through Saturday. He lived on land with his wife and went home every night. Plaintiff started most mornings inside an office where a safety meeting was conducted and plans were made for the day. The time these activities required varied from 20 minutes to an hour. Plaintiff would then board the Stingray at Port Sulphur. After boarding, he would check the oil and water, examine the battery terminals for corrosion, and ensure bolts were tight enough to prevent leakage. Plaintiff would travel to a different dock to add fuel. If plaintiff needed oil, water or other equipment, he would buy it there and put it in the boat himself. Plaintiff was responsible for general maintenance of the boat. In addition to the duties mentioned above, plaintiff changed the wheel when necessary, braided the ropes, inspected the steering mechanism and bilge, and kept the boat clean. Major repairs to the boat, however, were performed by a contractor.
Plaintiff further testified his routine after leaving the dock depended on the fields he was responsible for at the time. In one field, plaintiff needed to check four or five wells and one tank battery every day. In the other fields, plaintiff would only visit the wells and batteries when he needed to test them or when there was a problem. Plaintiff would perform any necessary minor repairs. Charles Porche, a Land Operations Superintendent who worked with plaintiff, testified plaintiff was responsible for changing chokes on the wells, adjusting gas lifts, changing needle valves, and any other small work that one person could do, but major repairs were done by the maintenance gang. On Saturday, the maintenance gang did not work and plaintiff testified he would handle everything himself on that day.
Plaintiff testified his job required navigating various bodies of water including lakes, bayous, canals, and bays. He would encounter traffic from barges, tug boats, crew boats, outboards, and fishing boats. He needed to know the area thoroughly in order to avoid obstructions under the water and navigate in traffic. In order to avoid crashing into platforms, plaintiff had to pay attention to currents while docking. Plaintiff also needed to be familiar with alternate routes to use during low tide and in bad weather. Mr. Porche testified it was Exxon's policy that operators such as plaintiff learn company marine safety rules and marine pilot rules. Steve Turner, plaintiff's supervisor from 1991 to early 1993, testified the main difference between plaintiff's job and the job of Senior Operators who worked on land was the mode of transportation used. Mr. Turner also testified plaintiff could not perform his job without a boat. Mr. Porche testified plaintiff would spend approximately three and one half hours of a shift traveling in the Stingray.
Plaintiff testified he regularly spent half of this shift on the various structures he visited. After reaching a well, plaintiff would usually tie the Stingray to the platform using a rope kept on the boat and stand on the well guard to perform his work. However, some well guards were unsafe and others were not large enough to walk on. In those cases, plaintiff would work from the deck of the Stingray. Plaintiff would also work from the boat when the weather prevented standing on the platforms. Plaintiff did not use the centrifuge every day, but every time he used the centrifuge, he had to be on the boat because the machine was bolted down inside.
In addition to the manual labor he performed, plaintiff also testified he engaged in paper work while out in the field, some of which he did while on the boat itself. Near the end of the day, plaintiff would return to his desk at the office to complete paperwork and to use the computer if necessary.
*1101 Defendant argues plaintiff does not qualify as a seaman. The company characterizes plaintiff as a land-based worker who used a boat merely as transportation and who did not perform a substantial amount of his work while aboard the boat. In support of this claim, defendant relies mainly on Munguia v. Chevron Co., U.S.A., 768 F.2d 649 (5th Cir. 1985); rehearing denied, 775 F.2d 301 (5th Cir.1985) (en banc), cert. denied, 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). The employee in Munguia worked as an oil field roustabout who used various boats for transporting himself and his equipment to the wells he serviced. The court found Munguia did not qualify as a seaman under the Jones Act for two reasons. First, Munguia was not assigned to the vessel he used on any kind of permanent basis. Instead, the court found the vessels were randomly assigned to him for the purpose of performing his work on the platforms. Second, Munguia did not perform a substantial part of his work while on the vessels; he worked mainly on the platforms. Water travel alone, the court explained, does not create seaman status. Id.
The instant case is distinguishable from Munguia in several respects. First, the Stingray was assigned to plaintiff. Although testimony indicated the Stingray was assigned to the field rather than plaintiff, the record also establishes the Stingray was the only boat plaintiff used. Furthermore, the Stingray was specifically equipped for the job plaintiff performed as Senior Operator. This fact diminishes the randomness of its assignment to plaintiff, whose position entailed using a particular type of boat. Munguia is also distinguishable because plaintiff in that case used boats merely for the purpose of traveling to the platforms. The plaintiff in the instant case, on the other hand, used the Stingray as a workplace, as well as for transportation. Finally, the amount of time plaintiff spent on the boat far exceeds that of the plaintiff in Munguia. Plaintiff used the boat every day, while Mr. Munguia used a boat only on occasions when he was assigned to work on wells rather than the tank battery.
In view of all the testimony, it was not unreasonable for the trial court to conclude plaintiff qualified as a seaman under the Jones Act. The evidence supports a finding plaintiff contributed to the functioning of the Stingray and had a substantial connection to it in terms of nature and duration.

NEGLIGENCE AND UNSEAWORTHINESS
As a seaman, plaintiff is entitled to bring an action for negligence under the Jones Act and for unseaworthiness under general maritime law. "Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action ..." Johnson v. Offshore, 845 F.2d 1347, 1354 (5th Cir.); cert denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). However, the manifest error standard of review applies in both general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96); 676 So.2d 89, 96.
Plaintiff was involved in three accidents during his employment with defendant which are the subject of this suit. The trial court found that all three accidents and the injuries which resulted were caused by defendant's negligence and/or the unseaworthiness of the Stingray. Defendants argue the trial court erred in making these findings because plaintiff was responsible for his own injuries.

Accident of July 2, 1991
While working on a tank battery, plaintiff slipped on a metal pipe union and injured his knee. Plaintiff testified a union is a round piece of pipe used to join other pieces of pipe. This particular union was one and a half inches long and two inches in diameter. Approximately two weeks before the accident, plaintiff noticed several pieces of equipment obstructing the walkway of the tank battery platform. He reported this to his supervisor and his supervisor talked to the foreman of the maintenance crew who had been working there earlier in the week. The foreman asked plaintiff if he could clean it up and plaintiff agreed. Plaintiff testified he cleaned the area as best he could by moving the equipment out of the walkway. Two weeks later, plaintiff stepped on the union while he was taking readings on the tank battery. Plaintiff testified he did not see the union before he stepped on it because it was painted the same color as the floor.
*1102 As plaintiff stepped on the union, his body moved forward to the right and he immediately felt severe pain in his right knee. This was not his first visit to the tank battery since he cleaned up the maintenance crew's mess. Plaintiff testified he had been on the platform the day before the accident and did not see any equipment in the walkway. However, another employee later told plaintiff someone else had been on the platform between plaintiff's visit the day before and the time he fell. After the accident, the pain persisted and increased. Two months later, plaintiff underwent surgery on his right knee.
The trial court found defendant was negligent and caused the injuries plaintiff suffered. The judge stated the accident resulted from the failure of defendant's employees to remove construction equipment from the walkway, exposing plaintiff to an unreasonable risk of injury. Defendant argues this incident occurred from the failure of plaintiff to pay attention to his surroundings and/or his failure to sufficiently clean the walkway. However, the evidence supports the finding of the trial court. Plaintiff testified his fall occurred approximately two weeks after he was asked to clean up the mess left by the other employees. In view of all the evidence, it was not unreasonable for the trial court to find plaintiff's knee injury resulted from the negligence of defendant.

Accident of March 28, 1992
Plaintiff hurt his back while loading a 55-gallon drum of oil from the Stingray onto a platform. Plaintiff testified the cylinders of a compressor needed to be lubricated to keep the compressor running and to avoid the "shutting in" (presumably, the stopping of operations) of the field. Plaintiff requested the oil earlier in the week, but no one brought it to the compressor. The maintenance crew would usually perform this task, but plaintiff testified they had been too busy to do it. Therefore, plaintiff was asked by Mr. Turner to transport it himself. The drum was loaded on the Stingray using a land-based crane at the Port Sulphur dock. Plaintiff expected he would be able to use a pump at the platform to transfer the contents of the drum. After he arrived, however, he discovered the pump was missing. Plaintiff testified he saw the pump on the platform the day before and was very surprised it was not there. The Stingray was equipped with a small pump, but it was insufficient for the job. Without a pump to transfer the contents or a crane to move the drum, the drum had to be lifted onto the platform manually. Plaintiff testified only one other employee was working that day and plaintiff tried unsuccessfully to call him for assistance. Plaintiff testified he did not think returning to the dock with the drum was a viable option because without oil for the compressor, he might have to shut in the whole field. Therefore, plaintiff moved the drum himself. As he was completing the task, he felt pain in his lower back. Plaintiff never saw a doctor for his back, but he reported to his supervisor that he pulled a muscle. Plaintiff testified the pain disappeared after a week or two and he missed no work as a result of the injury.

Negligence
The trial court found this accident and plaintiff's injuries to be the result of defendant's negligence. In its Reasons for Judgment, the trial court states "... Exxon knew that the means of transporting the oil and moving it from the vessel to the platform created an unreasonable risk of injury to Mr. Cappiello." The testimony indicates plaintiff's supervisor did not intend for plaintiff to lift the 55-gallon drum himself. Nonetheless, the pump necessary for plaintiff to safely transfer the contents of the drum onto the platform was missing when he arrived and plaintiff was confronted with a dilemma. Plaintiff testified he would have a lot to answer for if he had to shut in the field. "Although the seaman has a duty to use reasonable care, the seaman's duty to protect himself is slight since this duty is tempered by the realities of maritime employment."

Johnson, 845 F.2d at 1352.
Defendant argues this accident was caused by plaintiff's own negligence by lifting an object he should have known not to lift alone. Steve Turner testified he wore a beeper and could be reached at all times, but plaintiff did not call him. Even if it is true plaintiff could not reach anyone, defendant *1103 argued, plaintiff chose to manhandle the drum alone rather than return to the dock with the drum. However, assumption of risk is no defense in a Jones Act suit. Rush v. Cargo Ships & Tankers, Inc., 360 F.2d 766 (2nd Cir.); cert. denied, 385 U.S. 842, 87 S.Ct. 96, 17 L.Ed.2d 75 (1966). Furthermore, "[u]nder the Jones Act and the law of seaworthiness, contributory negligence, however gross, does not bar recovery, but only mitigates damages." Johnson, 845 F.2d at 1355.
The trial court did not err in concluding plaintiff felt compelled to move the drum under risky conditions created by defendant in failing to provide the platform pump. Therefore, the trial court's finding of negligence cannot be said to be manifestly erroneous or clearly wrong.

Unseaworthiness
The trial court also found plaintiff's injuries were caused by the unseaworthiness of the Stingray. "Liability under the doctrine of unseaworthiness does not rest upon fault or negligence." Johnson, 845 F.2d at 1354. "The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care" Johnson, id. A vessel is considered unseaworthy unless the vessel, its equipment, and crew are reasonably suited for the use for which they were intended. Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir.1992).
The trial court found plaintiff was injured because he did not have the aid of any other crew members and because the Stingray was not equipped with a crane to lift the drum or a proper pump or hoses to transfer the oil. Defendant argues there was no evidence to support a finding the Stingray was unseaworthy or that its condition proximately caused plaintiff's injury. "There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim." Johnson, 845 F.2d at 1354. "To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Id. at 1354. The Stingray, defendant argues, was intended for use as a mode of transportation and cannot be said to be unsuitable for this purpose. Defendant further argues plaintiff always worked alone and it was his duty to arrange for help when he needed it. That plaintiff did not have the proper equipment, defendant argues, was the result of plaintiff's failure to bring it rather than the unseaworthiness of the Stingray.
The testimony indicated neither plaintiff nor the Stingray were regularly assigned to the task of moving oil drums. However, plaintiff was asked to move an oil drum on this occasion using the Stingray, which was not equipped to handle the job. "Under general maritime law, unseaworthiness can be manifested by an unsafe method of work, such as the failure by a shipowner to provide adequate equipment for the performance of an assigned task." Johnson, 845 F.2d at 1354. Successful completion of the job anticipated use of a pump located on the platform rather than any extra manpower or equipment on board the vessel. Without use of the platform pump and with no other crew members to assist in the task, the Stingray was not equipped for its purpose on this mission. It was not unreasonable for the trial court to conclude the absence of proper equipment and manpower played a substantial part in bringing about plaintiff's injury. Accordingly, the trial court's finding that the Stingray's unseaworthiness proximately caused plaintiff's injuries is not manifestly erroneous.

Accident of March 30, 1993[3]
This accident occurred after plaintiff finished fixing a transfer pump on one of the batteries. Plaintiff testified that when he arrived at the platform, the weather was clear and conditions on the water were calm.
*1104 He tied the boat to the platform, disembarked, and started the job. Within minutes, plaintiff noticed a storm was moving in, but he was not finished with the pump. Plaintiff went back to the Stingray and tied it more securely before completing his work. Plaintiff testified he was on the battery for a total of approximately 45 minutes. By the time plaintiff returned to the boat, the storm had arrived and the water was turbulent. Plaintiff testified winds were 20 to 30 miles per hour, one of the ropes had broken and the boat was turned sideways. Plaintiff had a radio with him, but he made no attempt to call anyone at that time because, he testified, no one was available to help. Plaintiff threw his tools onto the deck and waited for the boat to return to a position where he could jump in. According to his testimony, he waited for the boat to reach its lowest point in the water and jumped out to meet the deck when the boat came up, which required covering a distance of one or two feet from the platform to the boat. Plaintiff testified it was common for him and others to board boats in this fashion. When plaintiff landed, his right leg gave out and he fell against the cabin and down onto the deck, injuring his back and both knees. Plaintiff testified he did not wait on the platform for the storm to pass because he feared the boat and/or the platform would be damaged if he failed to move the boat.

Negligence
The trial judge determined defendant was negligent because it was unreasonable for defendant to assign plaintiff to work alone after he had two knee surgeries, especially on a day (Saturday) when few personnel were available to assist him and during a time of year "when hazardous weather conditions can suddenly arise". Defendant maintains it did not require or encourage any employees to work in hazardous weather and argues it was plaintiff's own actions which brought about his injury. If plaintiff had simply waited on the platform for the storm to pass, defendant argues, he would not have been injured.
The evidence supports the trial court's decision. Defendant could not have known plaintiff would be caught in this particular storm, but defendant was aware storms frequently arise during the time of year this accident occurred. Defendant was also aware of plaintiff's physical limitations. After two knee surgeries, defendant continued to assign plaintiff to work alone as he had in the past, despite his weakened condition. Although plaintiff could have waited on the platform for the storm to pass, doing so would have meant risking damage to the boat and the platform. Plaintiff testified boarding the boat in rough seas was a common part of a Senior Operator's job. It was not unreasonable for the trial court to find plaintiff's injuries occurred as a result of defendant's actions in assigning plaintiff to a job they should have know he was physically illequipped to handle.

Unseaworthiness
The trial court also found the unseaworthiness of the Stingray caused plaintiff's injuries in this accident because the boat was not manned by a sufficient crew to assist plaintiff in its operation. Again, defendant argues the Stingray was equipped for its intended purpose of providing transportation. Defendant's failure to provide additional crew members to help plaintiff, they argue, cannot constitute a finding the Stingray was unseaworthy.
As stated earlier, a vessel is considered unseaworthy unless its equipment and work procedures are reasonably suited for the purpose for which it is intended. Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir.1992). Plaintiff operated the Stingray alone. Before his physical deterioration, plaintiff was perfectly capable of singularly performing the necessary tasks associated with operating the boat, including boarding it during rough weather. By the time this incident occurred, however, plaintiff was somewhat disabled as a result of his two knee operations. It was not unreasonable for the trial court to find the Stingray was unseaworthy on the basis it was unequipped with a crew reasonably suited for the hazards inherent in the job of Senior Operator. Therefore, we cannot say the trial court's finding of unseaworthiness was clearly wrong.

*1105 33 U.S.C. § 905 Claim

Exxon argues that plaintiff's alternative cause of action under section 905 of the Longshore and Harbor Worker's Compensation Act (33 U.S.C. § 905) has not been proven and is inapplicable, and that plaintiff cannot maintain an action against Exxon under 33 U.S.C. section 905(b).
Because we have already determined that the trial court did not err in finding that plaintiff proved he was entitled to damages pursuant to 46 U.S.C.A. § 688(a), the Jones Act, the issue of the applicability of 33 U.S.C. section 905(b) need not be addressed.

Computation of future income loss
Exxon argues the trial court erred in computing plaintiff's future income loss in a manner that failed to deduct social security taxes (net income), as required by the General Maritime Law.
Dr. Randolph Rice, a professor of economics at LSU was accepted as an expert forensic economist. Dr. Rice testified that he calculated future income loss as being $432,617. This is the exact figure awarded by the trial court judge for future lost wages, notwithstanding the fact that Dr. Rice admitted that in calculating future income loss, he did not include FICA or Social Security taxes in his calculations.
The issue of whether lost stream of future income should be computed utilizing after tax income has been addressed by various courts. In Culver v. Slater Boat Company, 722 F.2d 114 (5th Cir.1983), cert. denied, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984) and cert. denied, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984), the Court addressed the issue when it stated:
In [Jones & Laughlin Steel Corp. v.] Pfeifer, [462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983)] the Court recognized, as we did in Culver I, that calculation of the lost income stream begins with the gross earnings of the injured party at the time of injury. To this amount other income incidental to work, such as fringe benefits, should be added. From it, the fact-finder should subtract amounts the wage earner would have been required to pay, such as income tax and work expenses.
Id. at 117.
Further, in Madore v. Ingram Tank Ships, Inc., 732 F.2d 475 (5th Cir.1984) the court stated:
In computing the loss of future earnings, gross earnings should not be used. Unless the amounts the worker would have been required to pay in income taxes and social security taxes is negligible or should, for some articulated reason, be disregarded, the lost income stream must be computed after deducting the income taxes and social security taxes the worker would have paid had he continued to work, for he is entitled only to be made whole for what he has lost, his net income. Culver I, 688 F.2d at 302. (emphasis added)
Id. at 478-479.
Because the trial court erred by failing to calculate future income loss by taking into consideration income after tax, it is necessary for this court to determine the amount of future income loss. Although Dr. Rice did not deduct social security or F.I.C.A. tax from the $432,617 he calculated as future income loss, he testified 7.65 was the current rates for FICA taxes. Mr. Dan Cliffe, a CPA with a masters in Business administration was accepted by the court as an expert in economic analysis. Mr. Cliffe testified that utilizing a 7.65 rate for F.I.C.A. tax, the amount of social security taxes included in future income would be $38,000.
The trial court clearly had the discretion to decide which expert to believe, particularly in light of the fact that Dr. Rice had superior qualifications. However, the trial court does not have the discretion to ignore the mandates of federal law in determining damages in a case brought under federal law. Because this assignment of error has merit, the $38,000 amount which represents the proper deduction for social security taxes must be deducted from the $432,617 amount awarded for future income loss. Consequently, the award must be amended to award plaintiff $394,617 for future income loss.

*1106 Awarding of prejudgment interest on future damages

Exxon argues the trial court erred in awarding prejudgment interest on future damages.
The issue of whether prejudgment interest may be awarded on future damages in a Jones Act case tried in State Court was addressed by our Supreme Court in Milstead, 676 So.2d 89, wherein the Court stated:
[F]ederal courts have the discretion to award prejudgment interest on causes of action based upon their admiralty jurisdiction. However, courts have clearly chosen not to grant prejudgment interest on awards for future losses, including future earnings and future pain and suffering. Boyle v. Pool Offshore Company, 893 F.2d 713, 719 (5th Cir.1990); Martin, 794 F.2d at 212; Williams, 750 F.2d at 491. The rationale underlying this rule being that "recovery of interest on losses not yet incurred effectively grants the recipient double recovery." Martin, supra.

With these principles defined, it is clear that the trial court had discretion to grant Milstead prejudgment interest on the sums awarded as past damages in this general maritime and Jones Act claims. However, it had no authority to grant interest on the general maritime and Jones Act awards for future damages, be they future lost earnings or future pain and suffering, and the court of appeal erred in so finding.
The trial court did not apportion the sums awarded to the plaintiff. Thus, we remand this case to the trial court for a division of the judgment into past and future damages. In the trial court's discretion, prejudgment interest may be awarded only on past damages. (Citations omitted).
Id. at 97.
In the instant case, the trial court failed to limit its grant of prejudgment interest to damages for past loss of income, etc. Consequently this assignment of error also has merit.
For the reasons herein stated, the judgment of the trial court is amended to reflect that the award of future income loss is reduced by $38,000 from $432,617 to $394,617, and prejudgment interest is to be paid on past losses only. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED AS AMENDED.
NOTES
[1] The court found in favor of Exxon on Paula Cappiello's claim for loss of consortium and she has not appealed.
[2] Testimony differed on this point.
[3] Prior to this accident, in September of 1992, plaintiff underwent another surgery on his right knee.